OPINION OF THE COURT
Fuchsberg, J.
This appeal brings before us so much of an action for declaratory and injunctive relief as was brought by 12 "battered wives”[1] against clerks of the Family Court in New York City and officials of the New York City Department of Probation, each individually and as a defendant class representative. In a nutshell, the gravamen of their complaint is that probation and Family Court nonjudicial personnel, with the knowledge and either the tacit consent or express approval of *586 their supervisors, engage in a pattern of conduct calculated (1) to deter battered wives from filing petitions for orders of protection against their offending husbands, (2) to block them from meaningful access to Family Court Judges empowered to issue temporary orders of protection, and (3) by failing to advise the wives that the defendants’ proffer of counseling is voluntary, to dissuade complainants from pursuing their legal remedies.
In concept and in fact, the Family Court fulfills a unique function in our system of justice. Though its legal ministrations are not directed to the indigent alone, the social and economic factors that generate its mass of sensitive, emotion-laden and highly individualized cases — including those which feature the interspousal violence on which the plaintiffs focus —in practice flood its calendars with pro se litigants who must depend on the court rather than counsel to instruct them in the niceties of the legal process. It is no accident then that, of all our judiciary, only Judges of the Family Court must be qualified in areas of learning beyond those supplied by the practice of law (Family Ct Act, § 141).
Interestingly, too, a concomitant of the easy rationalization for essaying highly individualized dispositions in Family Court has been the adoption of more rather than less structured statutory and regulatory guidelines. Among these are specific provisions for an order of protection — a form of injunction by which an offending spouse (nearly always the husband)[2] may be compelled, under threat of imprisonment for up to six months, to refrain from particular offensive conduct or to stay away from the other spouse or the marital domicile — as well as follow-up petitions for violation of such orders (Family Ct Act, §§ 811, 821, 842, 846). And, to deal with the emergencies common to such cases, temporary orders of protection may issue on an ex parte basis (Family Ct Act, § 828). In either instance, since the spouse who seeks assistance almost invariably appears without counsel, a court clerk is provided to assist her in the preparation of petitions (see Family Ct Act, § 812, subd 2). Before, doing so, however, it is customary to refer the complaining spouse to the Family Court’s probation service (manned by city probation department personnel) for a preliminary screening during the course of which counseling *587 and referral services may be offered. However, such services are optional; their availability was not intended to discourage or prevent any person from pursuing the petition route directly (Family Ct Act, §§ 812, 823; Family Ct Rules, 22 NYCRR 2508.2 [d], 2508.2 [e] [2]; Paulsen, New York Family Court Act, 12 Buffalo L Rev 420, 439-440).[3]
Based on these provisions the complaint here, buttressed by affidavits of the named plaintiffs and some 48 other abused wives,[4] details a variety of instances in which either probation personnel or court clerks ignored requests for the prompt presentation of petitions to Family Court Judges, set cases down for counseling at postponed dates despite allegations of immediate danger, failed to advise complainants of their right to refuse counseling services and pursue summary legal relief, or discouraged the filing of any complaint whatsoever.[5] In short, while defendants conclusorily respond that they and their employees "are required to, and in practice do, comply with” the applicable statutes and rules, at the heart of plaintiffs’ case is the assertion that these norms have been regularly and repeatedly ignored.
Special Term denied defendants’ motions "to dismiss or, in *588 the alternative, for summary judgment” (90 Misc 2d 1047). The Appellate Division reversed and dismissed the complaint, holding the dispute nonjusticiable because its resolution would inevitably entail an impermissible "invasion of executive authority” (64 AD2d 582, 583).[6]
As we analyze this case, however, it is not one in which the judiciary would be required to enter upon a venture in which "it is ill-equipped to undertake the responsibility and [in which] other branches of government are far more suited to the task” (Jones v Beame, 45 NY2d 402, 408-409). Unlike Jones, which involved New York City’s allocation of municipal resources to house animals in public zoos and the State’s choice among (p 407) "theories and programs for deinstitutionalizing * * * the inmates of [its] crowded atid evermore crowding mental hospitals”, the subject of the present suit is the operation and administration of the courts by the courts.
True, the judicial process may not be designed to assume the management and operation of an executive enterprise or to correct broad legislative and administrative policy, which ultimately may be dependent on the political process (Jones v Beame, supra; People ex rel. Clapp v Listman, 40 Misc 372, 375-376, affd on opn below 84 App Div 633 [Andrews, J.]; De Funiak, Modern Equity [2d ed], pp 146-147), but justiciability hardly can be denied when what is at stake is not the righting of social injustices, deeply disturbing though they may be, but the enforcement of clear, nondiscretionary and easily definable statutes and rules adopted for the governance of a judicial entity. In essence, the concern that plaintiffs would have us confront is simply the threshold obligation of functionaries of the entity, here the Family Court, to apprise a woman of her options with respect to mediation and to afford her prompt access to a Family Court Judge.
Also, in this connection, the fact that the overwhelming majority of documented instances of alleged departure from statutory and regulatory provisions to which plaintiffs point *589 were at the hands of the probation personnel, formally employees of a city executive agency rather than a judicial one, does not take away from the justiciability of the controversy. For the probation service, in participating in the processing of family offense matters, does not act on its own. Rather it carries out a specified statutory obligation "to assist” the Family Court (Family Ct Act, § 252, subd [d]). Thus, court and probation employees work as a team in the implementation of the Family Court’s intake procedure. Indeed, it is the rules of the court itself that spell out authorization for such details of the probation service activity as obtaining the initial description of the problem that brings a wife to court, delving into social data and other background information relevant to the family offense and informing the interviewee that she may either avail herself of the probation department’s mediation and conciliation procedures or proceed at once via the petition route (see Committee Comments, McKinney’s Cons Laws of NY, Book 29A, Part 1, Family Ct Act, § 823, p 710; Besharov, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Part 1, Family Ct Act, § 252, pp 182-183; Family Ct Rules, 22 NYCRR 2508.1-2508.3).[7] Thus, while the probation department technically may not be part of the judicial establishment, the intertwining of its activities with those of the clerks of the Family Court entails responsibilities which basically are under court control.
But that justiciability is not an obstacle to plaintiffs’ action does not mean that declaratory or injunctive relief necessarily is in order. Such relief is to be granted or withheld largely on the circumstances in a particular case (New York Public Interest Research Group v Carey, 42 NY2d 527, 530; Megary & Baker, Snell’s Principles of Equity [24th ed], p 583; Mc-Clintock, Equity [2d ed], § 23). The efficacy or futility of judicial intervention is also a relevant consideration in decid-
ing whether such extraordinary relief is warranted (7A Weinstein-Korn-Miller, NY Civ Prac, par 6301.15).
These caveats in mind, we are less than convinced that any sufficiently useful purpose would be served by a plenary trial.
Among the factors that lead us to this conclusion is the *590 disposition already arrived at in the police branch of this litigation. A primary concern voiced in plaintiffs’ complaint is frequent failure of officers of the New York City Police Department to respond to requests for safeguarding made by or on behalf of a battered or threatened wife, presumably because of reluctance on the part of the police to intervene in what they reflexively characterized as "domestic disputes” rather than criminal offenses. And because 40% of all police night calls in New York City are said to involve such cases (Wife Beating: The Hidden Offense, NYLJ, April 29, 1976, p 1, col 1), this lack of police co-operation in guarding the offended wives makes Family Court processing delays critical and renders orders issued by the Family Court largely ineffective.
Negotiated with the police even before the Appellate Division handed down its decision, the consent judgment afforded the plaintiffs substantially all the relief they reasonably could expect. By its terms the police have agreed hereafter to respond swiftly to every request for protection and, as in an ordinary criminal case, to arrest the husband whenever there is reasonable cause to believe that a felony has been committed against the wife or that an order of protection or temporary order of protection has been violated. Moreover, officers are to remain at the scene of the alleged crime or violation in order to terminate or prevent the commission of further offenses and to provide the wife with other assistance. To assure that these undertakings are fulfilled, supervisory police officers are to make all necessary revisions in their disciplinary and other regulations.
It is also not without moment that an affidavit filed by Administrative Judge Joseph B. Williams of the Family Court makes it clear that his administration is dedicated to enforcing the statutes and rules in a manner consistent with the declarations sought by plaintiffs, particularly with regard to informing petitioners of the voluntariness of the conciliation option and to making Family Court Judges readily accessible to mistreated wives.
Significantly, in not a single instance did any plaintiff or affiant complain to Judge Williams, his executive officer or his chief clerk so that investigation or discipline of any offending employee could be initiated. Thus, there is no indication that, until commencement of this suit, the alleged derelictions had been brought home to those responsible for the administration of this branch of our courts.
*591 The record also indicates that the Director of the New York City Probation Department has conceded that its employees assigned to the Family Court have to advise women who appear for intake interviews in family offense cases of their right to reject offers of mediation and to proceed directly by petition. Within three months after this suit was instituted, and perhaps in response to it, the director issued General Order 5-77 promulgating a disciplinary procedure for the processing of oral and written complaints against probation employees who fail to adhere to these mandates. In addition, to limit the incidence of misunderstanding in communicating the alternatives open to wives who receive intake interviews, the probation people now are also required to routinely provide each prospective petitioner with a printed notice advising of the availability of professional counseling services and the right to reject them and go directly to court. To reach New York City residents who are Spanish-speaking, the notice is bilingual.
Nor has there been a lack of legislative and administrative response. Since the commencement of this suit section 812 of the Family Court Act was amended to prohibit officials from discouraging or preventing any person who wishes to file a petition from having access to the court for that purpose (L 1977, ch 449, § 1; see, also, Family Ct Rules, 22 NYCRR 2508.1 [c] [3] [4], [d], 2508.3 [c] [1]).
Of course, we are conscious of plaintiffs’ argument that the court practices of which they complain are unallayed despite the suit. But support for that position rests solely on nonrecord references (made for the first time in their brief to us) to a limited number of incidents occurring early in 1977. Even if taken at face value, these episodes transpired soon after plaintiffs’ action had been commenced and before the practical steps described above could have had any effect in a court which then was trying to cope with 20,000 pending family offense cases and was to face an intake of 9,540 new ones in 1977 (see Twenty-Third Ann Report of NY Judicial Conference, 1978, p 102). Realistically, we must also recognize that any system administered by human beings will unavoidably encounter occasions on which employees will err or be misunderstood, all the more so midst the stress and excitement that usually propels the pro se litigant into the legal arena.
Finally, we observe that societal concern with the underlying problem exemplified by brutality to women at the hands of *592 their husbands[8] must be carefully distinguished from the far narrower task committed to the Family Court — to deal with the local manifestations of this social malaise that are brought to its official attention. Except insofar as an awareness of general conditions helps put the matters at hand in perspective, only the latter can be within the scope of the suit before us.
So confined, the welcome efforts of plaintiff’s counsel and the amici in this case have no doubt alerted, even sensitized, our courts to the full measure of their responsibilities. With no real disagreement among the parties as to the goals toward which they must now aim, with constructive monitoring of Family Court staff performance by organizations such as the amici,[9] and with an appreciation of the raison d’etre for this suit by all courts that have been exposed to it, it could be fruitless, if not self-defeating, to go through a long and tortuous trial to no other end than the airing of what already has been made clear.
For all these reasons, and though our rationale, as indicated, in some respects differs from that of the Appellate Division, we find no reason to disturb the result it reached and therefore affirm its order, but without costs.

. As used here, the term "battered wives” refers to married women whose husbands have either committed crimes or violations against them or have violated orders of protection or temporary orders of protection issued by the Family Court.

. It is claimed that "in 29 out of every 30 such cases the husband stands accused of abusing his wife” (Leeds, Family Offense Cases in the Family Court System: A Statistical Description, Henry Street Settlement Urban Life Center, Nov., 1978, p ii).

. Subdivision 3 of section 812 of the Family Court Act provides: "No official or other person designated pursuant to subdivision two of this section shall discourage or prevent any person who wishes to file a petition or sign a complaint from having access to any court for that purpose.”
Subdivision (b) of section 823 of the Family Court Act provides: "The probation service may not prevent any person who wishes to file a petition under this article from having access to the court for that purpose”. (See, also, Family Ct Rules, 22 NYCRR 2508.1 [c] [3], 2508.3 [c].)

. Plaintiifs originally sued on behalf of themselves and all others similarly situated and, prior to defendants’ motions to dismiss, moved for class certification pursuant to CPLR 902. The complaint described the plaintiff class as "composed of all married women living in New York and Kings Counties whose husbands commit crimes or violations against them and who seek police and/or judicial protection from their husbands”. While the motion was denied as "unnecessary” upon the ground "that governmental defendants are bound by stare decisis”, the court added that "[t]he denial of class action status, of course, shall in no way limit plaintiffs’ right to fully present their evidence whether from party or nonparty witnesses”. (90 Misc 2d 1047, 1053-1054.) There has been no appeal from that decision.

. As plaintiffs flesh out their papers in opposition to the motion for summary judgment, to the flouting of statutes and rules they add such examples of deterrence as the dissemination of such misinformation as that orders are available only on the day a beating takes place, that the husband must be present at the time of complaint, that corroborative evidence independent of a complainant’s testimony is essential, that a lawyer is required, that a visible injury is a prerequisite for filing a petition, that the petitioner must serve her husband personally and that the facts must be verified by the husband.

. The Director of the New York State Division of Probation and officials of the New York City Police Department were also joined as defendants. But the director made no motion at nisi prius and hence is not a party to this appeal. And, so far as the police defendants are concerned, while they joined the moving defendants both in their unsuccessful atteihpt to dismiss in the trial court and in their subsequent appeal to the Appellate Division, prior to the latter court’s determination the police entered into a settlement the effect of Which was to moot their appeal at that stage. (The terms of the settlement are described later in this opinion.)

. Nisi prius granted so much of the clerk defendants’ motions to dismiss as related to causes of action seeking to hold them responsible, on a respondeat superior theory, for the conduct of probation department defendants. This determination was not, however, grounded in considerations of justiciability and, since the plaintiffs did not appeal it, was not passed on by the Appellate Division.

. Amici curiae advise us that one third to one half of all married women in America have experienced such mistreatment (see Schneider and Jordan, Representation of Women Who Defend Themselves in Response to Physical or Sexual Assault, Center for Constitutional Rights, 1978, p 100).

. Amici curiae who have appeared in support of appellants are the Association of the Bar of the City of New York, Women’s Survival Space, The Park Slope Safe Homes Project, The Jane Addams Center, Inc., The National Council of Churches of Christ, USA, Shelter Our Sisters, Inc., The Coalition for Abused Women, Inc., The New York City Coalition for Battered Women, New York Women Against Rape, All the Queens Women, The Asian American Legal Defense and Education Fund, The National Conference of Black Lawyers, NOW Legal Defense and Education Fund, Inc., and The National Lawyers Guild, New York Chapter. Some of these organizations reflect familiarity with the local and others with the national scene.