Tracey **THURMAN**, et al.

v.

**CITY OF TORRINGTON, et al.**

**Civ. No. H–84–120.**

United States District Court,
D. Connecticut.

Oct. 23, 1984.

Burton M. Weinstein, Weinstein, Weiner & Shapiro, Judith A. Mauzaka, Bridgeport, Conn., for plaintiffs.

Jesse M. Frankel, Cesar A. Noble, Stoner, Gross, Chorches, Lapuk & Kleinman, Hartford, Conn., Arnold J. Bai, Thomas M. Germain, Bai, Pollock & Dunnigan, Bridgeport, Conn., Timothy F. Woodbridge, West Hartford, Conn., Gerald R. Reis, Torrington, Conn., for defendants.

## RULING ON MOTION TO DISMISS

BLUMENFELD, Senior District Judge.

The plaintiffs have brought this action pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988, as well as the fifth, ninth, and fourteenth amendments to the Constitution, alleging that their constitutional rights were violated by the nonperformance or malperformance of official duties by the defendant police officers. In addition, the plaintiffs seek to hold liable the defendant City of Torrington (hereinafter, the "City"). The defendant City has filed a motion to dismiss the plaintiffs' complaint, or various claims therein, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

On a motion to dismiss, the sole issue is whether under the facts alleged in the plaintiff's complaint it appears to a certainty that the plaintiff is entitled to no relief. *Holmes v. Silver Cross Hospital of Joliet, Illinois*, 340 F.Supp. 125 (N.D.Ill. 1972). A complaint should not be dismissed unless it appears that the plaintiff could prove no set of facts in support of her claim which would entitle her to relief. *U.S. Steel Corp. v. Multistate Tax Commission*, 367 F.Supp. 107 (S.D.N.Y.1973). Furthermore, it is well settled that for purposes of a motion to dismiss, the well pleaded material allegations of the complaint are taken as true. 2A *Moore's Federal Practice* 2267, ¶ 12.08 n. 3. Accordingly, the material facts of this case are as follows:

Between early October 1982 and June 10, 1983, the plaintiff, Tracey Thurman, a woman living in the City of Torrington, and others on her behalf, notified the defendant City through the defendant police officers of the City of repeated threats upon her life and the life of her child, the plaintiff Charles J. Thurman, Jr., made by her estranged husband, Charles Thurman. Attempts to file complaints by plaintiff Tracey Thurman against her estranged husband in response to his threats of death and maiming were ignored or rejected by the named defendants and the defendant City.

An abbreviated chronology of the plaintiff's attempted and actual notifications of the threats made against her and her son by her estranged husband to the defendant City and police officers is appropriate for consideration of this motion.

In October 1982, Charles Thurman attacked plaintiff Tracey Thurman at the home of Judy Bentley and Richard St. Hilaire in the City of Torrington. Mr. St. Hilaire and Ms. Bentley made a formal complaint of the attack to one of the unnamed defendant police officers and requested efforts to keep the plaintiff's husband, Charles Thurman, off their property.

On or about November 5, 1982, Charles Thurman returned to the St. Hilaire-Bentley residence and using physical force took the plaintiff Charles J. Thurman, Jr. from said residence. Plaintiff Tracey Thurman and Mr. St. Hilaire went to Torrington police headquarters to make a formal complaint. At that point, unnamed defendant police officers of the City of Torrington refused to accept a complaint from Mr. St. Hilaire even as to trespassing.

On or about November 9, 1982, Charles Thurman screamed threats at Tracey while

she was sitting in her car. Defendant police officer Neil Gemelli stood on the street watching Charles Thurman scream threats at Tracey until Charles Thurman broke the windshield of plaintiff Tracey Thurman's car while she was inside the vehicle. Charles Thurman was arrested after he broke the windshield, and on the next day, November 10, 1982, he was convicted of breach of peace. He received a suspended sentence of six months and a two-year "conditional discharge," during which he was ordered to stay completely away from the plaintiff Tracey Thurman and the Bentley-St. Hilaire residence and to commit no further crimes. The court imposing probation informed the defendants of this sentence.

On December 31, 1982, while plaintiff Tracey Thurman was at the Bentley-St. Hilaire residence, Charles Thurman returned to said residence and once again threatened her. She called the Torrington Police Department. One of the unnamed police officer defendants took the call, and, although informed of the violation of the conditional discharge, made no attempt to ascertain Charles Thurman's whereabouts or to arrest him.

Between January 1, 1983 and May 4, 1983, numerous telephone complaints to the Torrington Police Department were taken by various unnamed police officers, in which repeated threats of violence to the plaintiffs by Charles Thurman were reported and his arrest on account of the threats and violation of the terms of his probation was requested.

On May 4 and 5, 1983, the plaintiff Tracey Thurman and Ms. Bentley reported to the Torrington Police Department that Charles Thurman had said that he would shoot the plaintiffs. Defendant police officer Storrs took the written complaint of plaintiff Tracey Thurman who was seeking an arrest warrant for her husband because of his death threat and violation of his "conditional discharge." Defendant Storrs refused to take the complaint of Ms. Bentley. Plaintiff Tracey Thurman was told to return three weeks later on June 1, 1983 when defendant Storrs or some other person connected with the police department of the defendant City would seek a warrant for the arrest of her husband.

On May 6, 1983, Tracey filed an application for a restraining order against Charles Thurman in the Litchfield Superior Court. That day, the court issued an ex parte restraining order forbidding Charles Thurman from assaulting, threatening, and harrassing Tracey Thurman. The defendant City was informed of this order.

On May 27, 1983, Tracey Thurman requested police protection in order to get to the Torrington Police Department, and she requested a warrant for her husband's arrest upon her arrival at headquarters after being taken there by one of the unnamed defendant police officers. She was told that she would have to wait until after the Memorial Day holiday weekend and was advised to call on Tuesday, May 31, to pursue the warrant request.

On May 31, 1983, Tracey Thurman appeared once again at the Torrington Police Department to pursue the warrant request. She was then advised by one of the unnamed defendant police officers that defendant Schapp was the only policeman who could help her and that he was on vacation. She was told that she would have to wait until he returned. That same day, Tracey's brother-in-law, Joseph Kocsis, called the Torrington Police Department to protest the lack of action taken on Tracey's complaint. Although Mr. Kocsis was advised that Charles Thurman would be arrested on June 8, 1983, no such arrest took place.

On June 10, 1983, Charles Thurman appeared at the Bentley-St. Hilaire residence in the early afternoon and demanded to speak to Tracey. Tracey, remaining indoors, called the defendant police department asking that Charles be picked up for violation of his probation. After about 15 minutes, Tracey went outside to speak to her husband in an effort to persuade him not to take or hurt Charles Jr. Soon thereafter, Charles began to stab Tracey repeatedly in the chest, neck and throat.

Approximately 25 minutes after Tracey's call to the Torrington Police Department

and after her stabbing, a single police officer, the defendant Petrovits, arrived on the scene. Upon the arrival of Officer Petrovits at the scene of the stabbing, Charles Thurman was holding a bloody knife. Charles then dropped the knife and, in the presence of Petrovits, kicked the plaintiff Tracey Thurman in the head and ran into the Bentley-St. Hilaire residence. Charles returned from within the residence holding the plaintiff Charles Thurman, Jr. and dropped the child on his wounded mother. Charles then kicked Tracey in the head a second time. Soon thereafter, defendants DeAngelo, Nukirk, and Columbia arrived on the scene but still permitted Charles Thurman to wander about the crowd and to continue to threaten Tracey. Finally, upon approaching Tracey once again, this time while she was lying on a stretcher, Charles Thurman was arrested and taken into custody.

It is also alleged that at all times mentioned above, except for approximately two weeks following his conviction and sentencing on November 10, 1982, Charles Thurman resided in Torrington and worked there as a counterman and short order cook at Skie's Diner. There he served many members of the Torrington Police Department including some of the named and unnamed defendants in this case. In the course of his employment Charles Thurman boasted to the defendant police officer patrons that he intended to "get" his wife and that he intended to kill her.

### I. *Motion to Dismiss the Claims of Tracey Thurman*

The defendant City now brings a motion to dismiss the claims against it. The City first argues that the plaintiff's complaint should be dismissed for failure to allege the deprivation of a constitutional right. Though the complaint alleges that the actions of the defendants deprived the plaintiff Tracey Thurman of her constitutional right to equal protection of the laws, the defendant City argues that the equal protection clause of the fourteenth amendment "does not guarantee equal application of social services." Defendant's Memorandum at 4. Rather, the defendant City argues that the equal protection clause "only prohibits intentional discrimination that is racially motivated" citing *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1979) and *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 547 (1976).

The defendant City's argument is clearly a misstatement of the law. The application of the equal protection clause is not limited to racial classifications or racially motivated discrimination. The equal protection clause will be applied to invalidate state laws which classify on the basis of alienage for the purpose of the distribution of economic benefits unless that law is necessary to promote a compelling or overriding state interest. *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); *In re Griffiths*, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). The equal protection clause will be applied to strike down classifications based on legitimacy at birth if they are not related to a legitimate state interest. *Pickett v. Brown*, 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983); *Mills v. Habluetzel*, 456 U.S. 91, 97–99, 102 S.Ct. 1549, 1553–1554, 71 L.Ed.2d 770 (1982). Classifications on the basis of gender will be held invalid under the equal protection clause unless they are substantially related to an important governmental objective, *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976), *reh'g denied*, 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977). And lastly, the equal protection clause will be applied to strike down classifications which are not rationally related to a legitimate governmental purpose. *San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 55, 93 S.Ct. 1278, 1308, 36 L.Ed.2d 16, *reh'g denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973).

In the instant case, the plaintiffs allege that the defendants use an administrative classification that manifests itself in discriminatory treatment violative of the equal protection clause. Police protection in the City of Torrington, they argue, is

fully provided to persons abused by someone with whom the victim has no domestic relationship. But the Torrington police have consistently afforded lesser protection, plaintiffs allege, when the victim is (1) a woman abused or assaulted by a spouse or boyfriend, or (2) a child abused by a father or stepfather. The issue to be decided, then, is whether the plaintiffs have properly alleged a violation of the equal protection clause of the fourteenth amendment.

Police action is subject to the equal protection clause and section 1983 whether in the form of commission of violative acts or omission to perform required acts pursuant to the police officer's duty to protect. *Smith v. Ross*, 482 F.2d 33, 36–37 (6th Cir.1973) ("law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection."); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972) (police officer liable under section 1983 for failing to prevent beating of plaintiff by other officers); *Azar v. Conley*, 456 F.2d 1382, 1387 (6th Cir.1972). *See also Cooper v. Molko*, 512 F.Supp. 563, 567 (N.D.Cal.1981), and *Huey v. Barloga*, 277 F.Supp. 864, 872–73 (N.D.Ill.1967) (failure of city officials and police officers to perform their duty of taking reasonable measures to protect personal safety of persons whom they know may be attacked is a denial of equal protection of the laws and is actionable under section 1983). City officials and police officers are under an affirmative duty to preserve law and order, and to protect the personal safety of persons in the community. *Id.* at 872. This duty applies equally to women whose personal safety is threatened by individuals with whom they have or have had a domestic relationship as well as to all other persons whose personal safety is threatened, including women not involved in domestic relationships. If officials have notice of the possibility of attacks on women in domestic relationships or other persons, they are under an affirmative duty to take reasonable measures to protect the personal safety of such persons in the community.

Failure to perform this duty would constitute a denial of equal protection of the laws.

Although the plaintiffs point to no law which on its face discriminates against victims abused by someone with whom they have a domestic relationship, the plaintiffs have alleged that there is an administrative classification used to implement the law in a discriminatory fashion. It is well settled that the equal protection clause is applicable not only to discriminatory legislative action, but also to discriminatory governmental action in administration and enforcement of the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Britton v. Rogers*, 631 F.2d 572, 577 (8th Cir.1980), *cert. denied*, 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981); and *Flipside, Hoffman Estates, Inc. v. Village of Hoffman Estates*, 485 F.Supp. 400, 409 (1980) (administrative classifications can give rise to an equal protection claim), *order rev'd on other grounds*, 639 F.2d 373 (7th Cir.1981), *judgment rev'd on other grounds*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362, *reh'g denied*, 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982). Here the plaintiffs were threatened with assault in violation of Connecticut law. Over the course of eight months the police failed to afford the plaintiffs protection against such assaults, and failed to take action to arrest the perpetrator of these assaults. The plaintiffs have alleged that this failure to act was pursuant to a pattern or practice of affording inadequate protection, or no protection at all, to women who have complained of having been abused by their husbands or others with whom they have had close relations. Amended Complaint, ¶ 13. Such a practice is tantamount to an administrative classification used to implement the law in a discriminatory fashion.

If the City wishes to discriminate against women who are the victims of domestic violence, it must articulate an important governmental interest for doing so. *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976), *reh'g denied*,

429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). In its memorandum and at oral argument the City has failed to put forward any justification for its disparate treatment of women.[1] Such a practice was at one time sanctioned by law:

> English common law during the eighteenth century recognized the right of husbands to physically discipline their wives. Subsequently, American common law in the early nineteenth century permitted a man to chastise his wife " 'without subjecting himself to vexatious prosecutions for assault and battery, resulting in the discredit and shame of all parties concerned.' " Some restrictions on the right of chastisement evolved through cases which defined the type, severity, and timing of permissible wife-beating....

B. Finesmith, *Police Response to Battered Women: Critique and Proposals for Reform,* 14 Seton Hall L.Rev. 74, 79 (1983) (citations omitted).

> In our own country a husband was permitted to beat his wife so long as he didn't use a switch any bigger around than his thumb. In 1874 the Supreme Court of North Carolina nullified the husband's right to chastise his wife "under any circumstances." But the court's ruling became ambiguous when it added, "If no permanent injury has been inflicted, nor malice, cruelty, nor dangerous violence shown by the husband, it is better to draw the curtain, shut out the public gaze, and leave the parties to forgive and forget."

Del Martin, "Scope of the Problem," *Battered Women: Issues of Public Policy* (1978) (Consultation Sponsored by the United States Commission on Civil Rights) (hereinafter "Consultation") at 6.

Today, however, any notion of a husband's prerogative to physically discipline his wife is an "increasingly outdated misconception." *Craig v. Boren,* 429 U.S. at 198–99, 97 S.Ct. at 457–58. As such it must join other "archaic and overbroad" premises which have been rejected as unconstitutional. *Crawford v. Cushman,* 531 F.2d 1114 (2d Cir.1976) (rejecting the notion that pregnancy renders servicewomen unfit and requires discharge); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 95 S.Ct. 1225, 1230, 43 L.Ed.2d 514 (1975) (rejecting proposition that the earnings of female wage earners do not significantly contribute to their families' support); *Frontiero v. Richardson,* 411 U.S. 677, 689, 93 S.Ct. 1764, 1771, 36 L.Ed.2d 583 (1973) (rejecting assertion that female spouses of servicemen would normally be dependent upon their husbands while male spouses of servicewomen would not be dependent upon their wives); *Stanton v. Stanton,* 421 U.S. 7, 14–15, 95 S.Ct. 1373, 1377–1378, 43 L.Ed.2d 688 (1975) (rejecting "old notion" that the female is destined solely for the home and the rearing of the family and the male only for the marketplace and the world of ideas).

A man is not allowed to physically abuse or endanger a woman merely because he is her husband. Concomitantly, a police officer may not knowingly refrain from interference in such violence, and may not "automatically decline to make an arrest simply because the assaulter and his victim are married to each other." *Bruno v. Codd,* 90 Misc.2d 1047, 1049, 396 N.Y. S.2d 974, 976 (1976), *rev'd on other grounds,* 64 App.Div.2d 502, 407 N.Y.S.2d 165 (1978), *aff'd,* 47 N.Y.2d 582, 419 N.Y. S.2d 901, 393 N.E.2d 976 (1979). Such inaction on the part of the officer is a denial of the equal protection of the laws.

---

**1.** It may develop that the classification in the instant case is not one based on gender, but instead consists of all spouses who are victims of domestic violence—male and female. At this stage of the proceedings, however, plaintiffs' allegations of gender-based discrimination will be taken as true. In one study of interspousal abuse it is claimed that "in 29 out of every 30 such cases the husband stands accused of abusing his wife." Leeds, *Family Offense Cases in the Family Court System: A Statistical Description,* Henry Street Settlement Urban Life Center, Nov. 1978, p. ii, cited in *Bruno v. Codd,* 47 N.Y.2d 582, 419 N.Y.S.2d 901, 902 n. 2, 393 N.E.2d 976, 977 n. 2.

In addition, any notion that defendants' practice can be justified as a means of promoting domestic harmony by refraining from interference in marital disputes, has no place in the case at hand.[2] Rather than evidencing a desire to work out her problems with her husband privately, Tracey pleaded with the police to offer her at least some measure of protection. Further, she sought and received a restraining order to keep her husband at a distance. Finally, it is important to recall here the Supreme Court's dictum in *Reed v. Reed*, 404 U.S. at 77, 92 S.Ct. at 254, that "whatever may be said as to the positive values of avoiding intrafamily controversy, the choice in this context may not lawfully be mandated solely on the basis of sex." Accordingly, the defendant City of Torrington's motion to dismiss the plaintiff Tracey Thurman's complaint on the basis of failure to allege violation of a constitutional right is denied.

## II. *Motion to Dismiss the Claims of Charles Thurman, Jr.*

Plaintiff Charles Thurman, Jr. also claims that the City of Torrington denied him the equal protection of the laws. He alleges that the defendants fail to protect children against the domestic violence of fathers and stepfathers. This claim fails on several grounds. Other than the June 10, 1983 assault, Charles Thurman, Jr. has alleged no attacks made against him. Unlike his mother Tracey Thurman, Charles was not alleged to be the victim of an attack in October of 1982 at the home of Judy Bentley and Richard St. Hilaire. It is also not alleged that Charles Thurman, Jr. was present on November 9, 1982, when his father broke the windshield of the vehicle carrying Tracey Thurman. There is no allegation that one of the conditions of Charles Thurman's condition discharge following his conviction for breach of peace on November 10, 1982 was to keep away from Charles Thurman, Jr., while it is alleged that one of the conditions was that he was to stay away from the plaintiff Tracey Thurman. Additionally, there is no allegation that the May 6, 1983 restraining order issued by the Litchfield Superior Court forbidding Charles Thurman from assaulting, threatening and harassing plaintiff Tracey Thurman, was issued in order to protect Charles Thurman, Jr. as well. Thus Charles Thurman Jr. did not suffer from a continuous failure of the police to provide him protection as did his mother, Tracey Thurman. The isolated failure of the defendants to prevent the June 10, 1983 assault on Charles Thurman, Jr. does not violate any constitutional rights. Charles Thurman, Jr.'s failure to adequately allege that the defendants denied him equal protection of the law requires that all claims of Charles Thurman, Jr. be dismissed for failure to state a claim upon which relief can be granted.

## III. *Have the Plaintiffs Properly Alleged a Custom or Policy on the Part of the City of Torrington?*

The plaintiffs have alleged in paragraph 13 of their complaint as follows:

During the period of time described herein, and for a long time prior thereto, the defendant City of Torrington acting through its Police Department, condoned a pattern or practice of affording inadequate protection, or no protection at all, to women who have complained of having been abused by their husbands or others with whom they have had close relations. Said pattern, custom or policy, well known to the individual defendants, was the basis on which they ignored said numerous complaints and reports of threats to the plaintiffs with impunity.

---

**2.** *See Finesmith, supra,* at 82 (referring to the factor of "Lack of Social/Legal Resources" as one of the variety of factors which combine to support the maintenance of violent households —"the societal and prosecutorial view that domestic abuse is a minor problem best handled in the home"). *Cf. id.* at 80, citing Eisenberg & Micklow, *The Assaulted Wife: Catch 22 Revisited,* 3 Women's Rights L.Rep. 138, 146 (1977). The "banner of supporting the marital relationship and domestic harmony" has also been seen as a justification for interspousal tort immunity. According to one commentator, that doctrine "appeared in court decisions of the early 1900's to prevent battered wives from bringing actions in tort against their abusing spouses."

While a municipality is not liable for the constitutional torts of its employees on a *respondeat superior* theory, a municipality may be sued for damages under section 1983 when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978).[3]

Some degree of specificity is required in the pleading of a custom or policy on the part of a municipality. Mere conclusory allegations devoid of factual content will not suffice. *See Schramm v. Krischell,* 84 F.R.D. 294 (D.Conn.1979). As this court has pointed out, a plaintiff must typically point to facts outside his own case to support his allegation of a policy on the part of a municipality. *Appletree v. City of Hartford,* 555 F.Supp. 224, 228 (D.Conn. 1983).

In the instant case, however, the plaintiff Tracey Thurman has specifically alleged in her statement of facts a series of acts and omissions on the part of the defendant police officers and police department that took place over the course of eight months. From this particularized pleading a pattern emerges that evidences deliberate indifference on the part of the police department to the complaints of the plaintiff Tracey Thurman and to its duty to protect her. Such an ongoing pattern of deliberate indifference raises an inference of "custom" or "policy" on the part of the municipality. *See Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), *reh'g denied,* 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977) and *Turpin v. Mailet,* 619 F.2d 196, 201–02 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Furthermore,

this pattern of inaction climaxed on June 10, 1983 in an incident so brutal that under the law of the Second Circuit that "single brutal incident may be sufficient to suggest a link between a violation of constitutional rights and a pattern of police misconduct." *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). Finally, a complaint of this sort will survive dismissal if it alleges a policy or custom of condoning police misconduct that violates constitutional rights and alleges "that the City's pattern of inaction caused the plaintiffs any compensable injury." *Batista v. Rodriguez,* 702 F.2d 393, 397–98 (2d Cir.1983); *Escalera v. New York City Housing Authority,* 425 F.2d 853, 857 (2d Cir.), *cert. denied,* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970) ("an action, especially under the Civil Rights Act, should not be dismissed at the pleadings stage unless it appears to a certainty that plaintiffs are entitled to no relief under any state of the facts, which could be proved in support of their claims"). Accordingly, defendant City of Torrington's motion to dismiss the plaintiffs claims against it, on the ground that the plaintiffs failed to properly allege a custom or policy on the part of the municipality, is denied.

## IV. *The Unidentified Police Officers*

Defendant City of Torrington has moved to dismiss the claims against the unidentified police officers claiming that this court lacks jurisdiction over these parties as they have not been properly served. At this stage of the proceedings, such a dismissal would be inappropriate:

> at this time, before plaintiff has had an opportunity to engage in discovery which could disclose the exact identity of the officers whom plaintiff presently is able to partially identify …, the Court discerns no purpose in dismissal of the "John Doe" defendants.

**3.** Such a custom or policy, if found to exist in the instant case, would not be unique. *See Finesmith, supra,* at 84–101, where the author

outlines the official police guidelines for dealing with domestic disputes in 30 major American cities.

*Saffron v. Wilson,* 70 F.R.D. 51, 56 (D.D.C. 1975); *Maggette v. Dalsheim,* 709 F.2d 800, 803 (2d Cir.1983). Hence, defendant's motion, to the extent that it suggests dismissal of the unidentified defendants, is denied without prejudice to its renewal at a later date.

## V. *Pendent Jurisdiction Over Plaintiffs' State Law Claim*

The defendant City of Torrington has moved to dismiss the sixth count of plaintiffs' complaint which asks this court to exercise its discretionary powers to maintain pendent jurisdiction over their state claim based upon Conn.Gen.Stat. § 7–465 which concerns a municipality's liability for the tortious acts of its employees. Although the defendant City has moved to dismiss this count for alleged lack of jurisdiction, there is nothing in the defendant's accompanying memorandum which either discusses or supports its request. The plaintiffs correctly point to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) for the proposition that this court indeed does have discretion to exercise its pendent jurisdiction to hear the state law claims that arise from a common nucleus of operative facts with the associated federal claims.

In the instant case, however, I will decline to exercise pendent jurisdiction over the state law claim. In the case of *Gonzalez v. Doe,* 476 F.2d 680 (2d Cir.1973), the Second Circuit upheld Judge Clarie's decision to dismiss a pendent state law claim under Conn.Gen.Stat. § 7–465 in a section 1983 action for reasons which are equally applicable to this case and which I find to be persuasive:

> there is no reason to assume that, if necessary, the state courts would not grant full faith and credit to any judgment obtained against the municipal officials in the federal court.... [I]f the City should contest its obligation to pay any judgment rendered against its employees, the issues of whether they were "acting in the performance of [their] duties and within the scope of [their] employment" and whether the damage was "the result of any wilful or wanton

act" would likely be raised. Those issues concern the interpretation of a state statute and the Supreme Court reminded us in *Gibbs* that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. at 726, 86 S.Ct. at 1139. Moreover, to the extent that the standards to be applied and the proof required to meet them in order to render the City liable under the state statute differ from the standards and proof required to render the individual defendants liable under § 1983, any jury which might be empanelled would be subject to confusion which it would be best to avoid. Finally, there is the possibility that a jury might be prejudiced against the other defendants on the primary claims if it knew from the claim against the City as a defendant that it might be obligated as an indemnitor to pay for any judgment assessed.

*Id.* at 686–87 (footnotes omitted).

The sixth count of the complaint is, therefore, dismissed.

## Conclusion

For the reasons stated above, the City's motion to dismiss the complaint for failure to allege the deprivation of a constitutional right is denied; the City's motion to dismiss the claims of Charles Thurman, Jr. is granted; the City's motion to dismiss the claims against it for failure to properly allege a "custom" or "policy" on the part of the City is denied; the City's motion to dismiss the claims against the unidentified police officers for lack of jurisdiction due to improper service is denied without prejudice to its renewal at a later date; and, finally, the City's motion to dismiss the sixth count of the complaint is granted.

SO ORDERED.