STATE ex rel. HOPE HOUSE, INC., Relator,

v.

Commissioner Molly M. MERRIGAN, Circuit Court of Jackson County, Missouri, Family Court Division, Respondent.

No. SC 85638.

Supreme Court of Missouri, En Banc.

April 13, 2004.

Motion for Rehearing and/or Modification Denied May 25, 2004.

Mary F. Weir, Independence, for appellant.

Polly S. Bartle, Melissa A. Stanosheck, Teresa L. Steelman, Kansas City, for respondent.

A. Renae Adamson, Kansas City, Guardian ad Litum.

Lynn W. Judkins, Kansas City, for Natural Mother.

RICHARD B. TEITELMAN, Judge.

Hope House, Inc., a domestic violence shelter, seeks a writ of prohibition to prevent the respondent from denying a mo-

tion to quash the subpoena of records pertaining to Maria Martinez's stay at its shelter. The underlying case involves a juvenile officer's petition alleging child abuse and neglect by Ms. Martinez. The issue presented is whether section 455.220, which establishes strict confidentiality requirements to safeguard the identity and location of shelter residents, is subject to the limitation on privileged communications set forth in section 210.140.[1] Section 210.140 provides that "any legally recognized privileged communication," except that between attorney and client and communications made to a clergyperson, "shall not apply to situations involving known or suspected child abuse or neglect...." Because section 455.220 does not constitute a legally recognized privileged communication subject to section 210.140, the writ is made absolute as modified.[2]

### FACTS

On September 8, 2002, Ms. Martinez left her two children with a caregiver at the New House domestic violence shelter. The children were placed in protective custody, and a petition was filed in the juvenile division of the circuit court on the children's behalf. On November 25, 2002, the court ordered that the children remain in their mother's custody under the supervision of the division of family services. Ms. Martinez and her children subsequently moved from three different domestic violence shelters, the last being Hope House. The juvenile officer asserts that Ms. Martinez was discharged from Hope House on January 2, 2003.

On January 14, 2003, the court held a hearing regarding Ms. Martinez's living situation and permitted the children to stay with their mother. On January 28, 2003, the court held a dispositional hearing and ordered that Ms. Martinez would retain custody of her children.

On February 4, 2003, the juvenile officer filed a motion to modify the disposition. In the meantime, Ms. Martinez again sought refuge in a domestic violence shelter. On July 28, 2003, the court held a hearing on the juvenile officer's motion and ordered the children to remain in the custody of Ms. Martinez. The next day, the juvenile officer filed an amended motion to modify disposition. The officer alleged that Ms. Martinez had failed to maintain stable housing because she lived in three different domestic violence shelters between October 2002 and January 2003. The officer's petition also faulted Ms. Martinez for being involved in a domestic violence relationship. There has been no hearing on the amended petition.

During the course of this litigation, the director of Hope House was served a subpoena duces tecum ordering her to appear and produce any and all of the shelter's records relating to Maria Martinez and her children. Hope House filed a motion to quash the subpoena, arguing section 455.220 required the records to be kept confidential. The motion was overruled. Hope House filed a petition for writ of prohibition. The court denied the petition, holding that section 455.220 was a legally recognized privilege subject to the limitations of section 210.140.

### ANALYSIS

I. *Domestic Violence and Confidentiality*

Domestic violence is one of the most serious threats to the safety and welfare of

---

1. All statutory references are to RSMo 2000.

2. The proper respondent is the Honorable W. Stephen Nixon of the Jackson County Circuit Court. The writ, as modified, is directed towards the Honorable W. Stephen Nixon.

women, children, and families. Although the adult victims of domestic violence represent all demographics, the overwhelming majority is women. *Thurman v. City of Torrington*, 595 F.Supp. 1521, 1528 n. 1 (noting that twenty-nine of thirty domestic violence victims are women); Katernine M. Culliton, *Finding a Mechanism to Enforce Women's Right To State Protection from Domestic Violence In the Americas*, 34 HARV. INT.'L L.J. 507, 558 (1993). The United States Department of Justice has estimated that at least two million women are severely assaulted by their partners every year. *Bureau of Justice Statistics, U.S. Dept. of Justice, Violence Against Women: Estimates from the Redesigned Survey* (1995). Nearly thirty-five percent of women visiting hospital emergency rooms do so because of injuries stemming from domestic violence. H.R.Rep. No. 395, 103rd Cong., 1st Sess. at 86 (1993). The American Medical Association reported that "domestic violence accounts for at least 21,000 hospitalizations, 99,800 days in the hospital, and 39,000 visits to personal physicians annually in the United States." Machaela M. Hoctor, *Domestic Violence as a Crime Against the State: The Need for Mandatory Arrest in California*, 85 CAL. L.REV. 643, 645 (1997). Violence is the number one cause of injuries to women ages 14–41. *Id.*

Domestic violence victims frequently find themselves thrust into a nearly impossible dilemma. If they stay with the abuser, the abuse will likely continue. If they choose to leave, the risk of escalated violence may actually increase. Joan Zorza, *Recognizing and Protecting the Confidentiality Needs of Battered Women*, 29 FAM. L.Q. 273, 274 (1995). Further complicating matters, women in abusive relationships are often financially dependent upon their abusers to meet the basic needs of themselves and their children, creating a powerful incentive to stay despite the vio-

lence. Martha F. Davis & Susan J. Kraham, *Protecting Women's Welfare in the Face of Violence*, 22 FORDHAM URB. L.J. 1141, 1150 (1995); see also, *Planned Parenthood v. Casey*, 505 U.S. 833, 891–892, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (recognizing that abusers often isolate victims from financial resources required for leaving the relationship). Some women decide that staying in the abusive relationship is the best option among a set of bad alternatives for themselves and their children. For those women that are able to leave, their safety and that of their children often depend upon maintaining the secrecy of their whereabouts. In this context, strict confidentiality is an essential component for protecting women and children seeking refuge from their abusers. Zorza, supra, 29 FAM. L.Q. at 295.

## II. *Section 455.220: Strict Confidentiality for Domestic Violence Victims*

Section 455.220.1(5) codifies the strict confidentiality policy necessary for shelters effectively to provide a safe harbor for domestic violence victims. The statute makes shelters:

> Require persons employed by or volunteering services to the shelter to maintain confidentiality of any information that would identify individuals served by the shelter and any information or records that are directly related to the advocacy services provided to such individuals.

There are five distinguishing features of this confidentiality requirement.

First, the shelter is prohibited from releasing any information that "would identify" the domestic violence victim. Information that would identify the shelter victim includes more than simply the victim's name. It encompasses an array of potentially identifying characteristics such

as former residences, place of employment, identity of the abuser or even a physical description of the resident. This reflects the role of the shelter as a last resort from an abusive relationship and underscores the critical importance of anonymity and secrecy in shielding the victim's location from the abuser. If the victim's residence at a shelter is discovered by the abuser, not only is the victim's safety imperiled, but the safety and security of other shelter residents is threatened as well. Thus, the confidentiality requirements benefit both the particular resident from whom information is sought as well as every other shelter resident.

■ Second, the shelter is also prohibited from releasing any information regarding advocacy services provided to individuals served by the shelter. The secrecy of these communications is necessary not only as a corollary to the requirement that the victim's identity be protected, but also to encourage victims to seek refuge from their abusers without fear of retribution for informing third parties about the abusive relationship.

■ Third, the confidentiality requirements apply to all shelter workers or volunteers and are not contingent upon a shelter worker having any contact or communication with the resident. The statute would, for example, prohibit a volunteer maintenance worker from divulging any information regarding any resident he or she may have seen at the shelter. Thus, the confidentiality requirement under section 455.220.1(5) arises not within the context of a protected relationship such as attorney and client, but within a context where confidentiality is essential to curtail an imminent threat of violence.

■ Fourth, nothing in section 455.220 limits the time frame or context in which the confidentiality requirements apply. All shelter employees and volunteers, as well as the resident, must maintain confidentiality at all times. There are no exceptions within the statute requiring a suspension or waiver of confidentiality in any context.

■ Finally, the shelter resident cannot waive the section 455.220.1(5) confidentiality requirement until testimony is sought regarding shelter records and information. Section 455.220.2.[3] Prior to that time, the shelter resident cannot waive confidentiality even if it would be to his or her benefit. The confidentiality requirements are not simply a power vested in the shelter resident. Instead, the confidentiality requirements serve the broader purpose of preserving strict confidentiality of shelter records for the benefit of other shelter residents and the people that assist them. Even when the records or information is requested, the statute does not require that the resident waive confidentiality. That decision is left to the resident.

III. *Section 210.140*

■ In contrast to the myriad confidentiality requirements of section 455.220, section 210.140 serves only to limit the application of some evidentiary privileges in situations involving child abuse or neglect. The statute provides that:

> Any legally recognized privileged communication, except that between attorney and client or involving communications made to a minister or clergyperson, shall not apply to situations involving known or suspected

3. Any person employed by or volunteering services to a shelter for victims of domestic violence shall be incompetent to testify concerning any confidential information described in subdivision (5) of subsection 1 of this section unless the confidentiality requirement is waived in writing by the individual served by the shelter.

child abuse or neglect and shall not constitute grounds for failure to report as required or permitted by sections 210.110 to 210.165, to cooperate with the division in any of its activities pursuant to sections 210.110 to 210.165, or to give or accept evidence in any judicial proceeding relating to child abuse or neglect.

In this case, the operative limitation on section 210.140 is that it applies only to a legally recognized "privileged communication." The statute does not define the term "privileged communication." In the absence of a statutory definition, the term will be given its plain meaning as derived from the dictionary. *State ex rel. Linthicum v. Calvin*, 57 S.W.3d 855, 867 (Mo. banc 2001). According to Black's Law Dictionary, a privileged communication is a "communication that is protected by law from forced disclosure." BLACK'S LAW DICTIONARY 273 (7th ed.1999). This is not the complete definition however, as the central concept of what constitutes a privilege is not fully developed. Thus, the reader is referred to subsection (3) of the definition of "privilege," which, in pertinent part, provides that a privilege is "[a]n evidentiary rule that gives a witness the option not to disclose the fact asked for, even though it might be relevant ... esp. when the information was originally communicated in a professional or confidential relationship." *Id.* at 1215. The various traditionally recognized evidentiary privileges such as physician-patient and husband-wife are then defined and listed as examples of evidentiary privileges. Thus, the privileged communications referenced in section 210.140 are those traditionally recognized evidentiary privileges, such as physician-patient, that are limited to specific communications between particular groups. As such, the privileged communications referenced in section 210.140 do not establish a blanket rule of confidential-

ity, but instead are procedural rules granting the privilege holder a limited right to protect specific communications from disclosure.

The section 455.220 confidentiality requirements are distinguishable from the privileged communications referenced in section 210.140. The section 455.220 confidentiality requirements apply to all shelter workers and volunteers independent of any contact with the resident. Confidentiality is mandated not simply to foster open communication in a private relationship, but to ensure the physical safety of all persons involved with the shelter. Furthermore, unlike the limited scope of the privileged communications referenced in section 210.140, the section 455.220 confidentiality requirements also apply to an array of information beyond any communications between a resident and shelter worker. Even the resident's identity must remain confidential. Finally, the confidentiality requirements may not be waived at any time except at the option of the resident when testimony is ordered. Section 455.220.2. The section 455.220 confidentiality requirements are not privileged communications within the meaning of section 210.140.

Nonetheless, the juvenile officer further argues that the last clause of the statute negates the confidentiality provision of section 455.220, because it states that the existence of a privilege "shall not constitute grounds for failure to report ... *or to give or accept evidence in any judicial proceeding relating to child abuse or neglect*" (emphasis added). This argument fails because the quoted clause applies only to the subject of section 210.140, which is "legally recognized privileged communication." As previously established, the confidentiality provision of section 455.220 is not a recognition of a new legally privi-

leged communication, but rather is a recognition of the confidentiality of an entire body of information, including not just communications, but name, location, history, and so forth. The section 210.140 limitations on privileged communication do not apply to the section 455.220 confidentiality requirements.

### CONCLUSION

 Although trial courts are generally vested with broad discretion regarding discovery, requiring Hope House to produce statutorily protected information is an abuse of discretion. See *Leritz v. Koehr*, 844 S.W.2d 583, 583 (Mo.App.1993). The order denying Hope House's motion to quash the subpoena violates the confidentiality requirements of section 454.220. The writ as modified is made absolute.

WHITE, C.J., WOLFF and STITH, JJ., concur.

LIMBAUGH, J., dissents in separate opinion filed.

BENTON and PRICE, JJ., concur in opinion of LIMBAUGH, J.

STEPHEN N. LIMBAUGH, JR., Judge, dissenting.

I respectfully dissent.

Section 455.220[1] sets out the requirements that a domestic violence shelter must meet to qualify for federal funding. One of the requirements is for

> persons employed by or volunteering services to the shelter to maintain the confidentiality of any information that would identify individuals served by the shelter and any information or records that are directly related to the advocacy services provided to such individuals;

Sec. 455.220.1(5). To ensure compliance with the confidentiality requirements, the statute also provides:

> Any person employed by or volunteering services to a shelter ... shall be incompetent to testify concerning any confidential information described in subdivision (5) ... unless the confidentiality requirement is waived ... by the individual served by the shelter.

Sec. 455.220.2.

In contrast, section 210.140, a part of the Juvenile Code, states in pertinent part:

> Any legally recognized privileged communication, except that between attorney and client or involving communications made to a minister or clergyperson, shall not apply to situations involving known or suspected child abuse or neglect....

As I understand the majority opinion, the mandate of section 210.140 does not encompass the information deemed confidential in section 455.220, because that information is categorically different than the "legally recognized privileged communication[s]" to which section 210.140 is addressed. This is the fundamental point of disagreement, though I do agree with the majority that the answer may be found in the dictionary. As the majority correctly notes, a "privileged communication" is a "communication that is protected by law from forced disclosure." BLACK'S LAW DICTIONARY 273 (7th ed.1999), and a "privilege" is "[a]n evidentiary rule that gives a witness the option not to disclose the fact asked for, even though it might be relevant ... esp. when the information was originally communicated in a professional or confidential relationship." *Id.* at 1215. Section 455.220 fits well within those definitions. It is a "law" that expressly protects certain confidential information from

---

**1.** All statutory references are to RSMo 2000, unless otherwise indicated.

"forced disclosure" when it is communicated to shelter employees and volunteers by the individuals they serve. In addition, it is a "privilege" because an individual served by a shelter is in a "confidential relationship" and may waive or not waive disclosure of confidential information, which, in this setting, is an "option not to disclose the fact asked for." Thus, under both definitions, the communication of confidential information under section 455.220 is a "legally recognized privileged communication."

In my view, sections 455.220 and 210.140, both of which pertain to "legally recognized privileged communications," appear to be in conflict when applied to cases in which an individual served by a domestic violence shelter is accused of child abuse or neglect. The conflict arises because section 455.220 establishes a legally recognized privilege that presumably applies to communications that involve child abuse and neglect, as is alleged here, while section 210.140 mandates that legally recognized privileges (except those pertaining to attorneys and to clergy) shall *not* apply to communications involving child abuse or neglect.

"Statutes which seemingly are in conflict should be harmonized so as to give meaning to both statutes." *State ex rel. Riordan v. Dierker*, 956 S.W.2d 258, 260 (Mo. banc 1997). In that effort, the courts must "ascertain the intent of the legislature . . . (and) give effect to that intent if possible. . . ." *Id.*

In this case, the conflict is best resolved by reference to the overriding expression of legislative intent as stated in section 211.011: "The child welfare policy of this state is what is in the best interests of the child." In view of that policy, the legislature must have intended that section 210.140 applies notwithstanding section 455.220 and that section 210.140 is, in effect, an exception to section 455.220.

This conclusion is borne out by reviewing the operation of the two statutes. On the whole, the best interests of children who are at risk due to abuse or neglect are not well served by section 455.220, because it creates a testimonial privilege that precludes the discovery and admission of evidence that children have been abused or neglected by a parent. Instead, the best interests of children are better served by a truth-seeking process in which all testimony and other evidence relevant to the allegations of abuse and neglect are discoverable and admissible. Indeed, that is the very purpose of section 210.140—to promote the best interests of children at risk by eliminating the privilege in order to further that truth-seeking process. *See State v. Ward*, 745 S.W.2d 666, 670 (Mo. banc 1988). Although in some small sense children may benefit from section 455.220's confidentiality rules to the extent that the rules encourage domestic violence victims to seek the protection of shelters not only for themselves but also for their children, that benefit, in my view, is far outweighed by the detriment caused in situations where the parent seeking shelter may be abusing or neglecting the children.

Unfortunately, the majority makes no effort to reconcile the statutes, and its sole concern seems to be the perceived harm caused by the loss of confidentiality. But, it must be emphasized that under my analysis, elimination of the privilege would apply only in the relatively few cases in which the domestic violence victim in a shelter is accused of abuse and neglect, and, even then, the privilege would remain in effect for all other purposes. In fact, no one outside the shelter setting would have access to the confidential information except as it relates to a formal adjudication in the juvenile court, which is itself a confi-

dential proceeding. The majority's concern is not well-founded.

In sum, I would harmonize the statutes by holding that section 210.140 constitutes an exception to the confidentiality rules of section 455.220 in cases of child abuse or neglect, and, thus, the court was justified in ordering production of the Hope House records. I would quash the writ.