Daniel ESCAMILLA, Sandra Escamilla and each of the minors, Cynthia Escamilla, Nedra Escamilla, Jessica Ramirez and Benjamin Calindo, by Daniel Escamilla, their Guardian ad Litem, Plaintiffs,

v.

CITY OF SANTA ANA, a Municipal corporation, Raymond C. Davis, in his individual and official capacity as Chief of Police of Santa Ana; Officers John D. Garcia and R. Huerth, in their individual and official capacities as sworn Santa Ana Police Officers; Jesus Jimenez; La Posada Mexican Restaurant of Santa Ana; Jakob Mueller and Irmengard Mueller, in their official capacities as corporate officers, Defendants.

No. CV 83–1887–ER (Kx).

United States District Court, C.D. California.

March 6, 1985.

John Eric Lindgren, Santa Ana, Cal., for plaintiffs.

Don Zell, Kinkle Rodiger & Spriggs, Meir J. Westreich, Santa Ana, Cal., for defendants.

## JUDGMENT AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

RAFEEDIE, District Judge.

This case came before the Honorable Edward Rafeedie, United States District Judge, on January 21, 1985 on the motion of defendants City of Santa Ana, Police Chief Davis, Officer Huerth and Officer Garcia for summary judgment on plaintiffs' claims under 42 U.S.C. § 1983, 1985, and 1986.[1] Having considered the parties' papers, oral argument, and the evidence submitted, the Court renders the following order and judgment:

### I. FACTUAL BACKGROUND

The facts stated herein are considered in the light most favorable to the plaintiffs. The Court has found, in accordance with Federal Rule of Civil Procedure 56, that there are no genuine issues of material fact.

This civil rights action is the result of a barroom shooting incident which resulted in the death of plaintiffs' mother, Mary Medina, an innocent bystander. The shooting occurred at the La Posada Mexican Restaurant on the evening of March 28, 1980. Defendant police officers Huerth and Garcia were in the La Posada that night as undercover agents checking for general liquor law violations. They did not disclose their true identities to anyone on the premises.

While they were present, a verbal argument broke out between two patrons, Jesus Jimenez and Jesse Castellanos. Huerth heard Jimenez tell his friend to go and get Jimenez' gun. As Jimenez and his friend left the bar, the officers noticed that Castellanos was following them and that he had a gun protruding from his pocket. At that point Huerth instructed Garcia to get in his vehicle, drive to a place out of sight of the La Posada, and call for uniformed officers as back-up.

Soon after Garcia left, a fight broke out in the crowded bar between Jimenez and Castellanos. In a matter of seconds, bottles were flying and gunshots were ringing out, but no one appeared to be injured. Almost instantaneously, another fight erupted in the back of the bar, and Huerth turned his attention there. Seconds later Huerth heard five more gunshots come from the door area, site of the original fight, and he turned in that direction. During this second round of gunfire, a bullet from Jimenez' gun fatally wounded Ms. Medina, who was sitting at the bar.

Jimenez fled and both officers (Garcia now back from making the call) pursued

---

1. On May 15, 1984 the Court dismissed plaintiffs' pendent state claims under the principles set forth in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). This dismissal leaves only the civil rights claims remaining.

the suspect in the patrol car. Unsuccessful, they returned to the La Posada where uniformed policemen and paramedics were treating Ms. Medina. At this point, the officers identified themselves for the first time.

According to Officer Garcia's deposition, he and Huerth had been working together for approximately four months at the time of the incident. During this time they had encountered non-violent criminal situations on sixteen to twenty occasions and consistently had had one officer leave the altercation and call for uniformed help, thereby preserving their cover.

## II. LEGAL DISCUSSION

### A. *Claims under 42 U.S.C. § 1983*

#### 1. *Constitutional Duty*

The thrust of plaintiffs' § 1983 claims is that the defendants propagated a policy of having undercover officers maintain their cover, even when faced with imminent life-threatening criminal activity. Plaintiffs contend that this policy was the proximate cause of Ms. Medina's death.

■ In focusing on the causation question,[2] however, plaintiffs gloss over the question of whether defendants had a constitutional duty to intervene more quickly. A constitutional duty is to be distinguished from a normal tort duty because "it is perfectly clear that not every injury in which a state official has played some part is actionable under [1983]." *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). Moreover, in *United States ex rel. Miller v. Twomey*, 479 F.2d 701, 720–21 (7th Cir.1973), then Judge Stevens held that, to establish a constitutional claim, a plaintiff must prove more than that a state official made a

decision which created "foreseeable risks of violence."

Thus, parole supervisors had no constitutional duty to revoke the parole of a man before he raped, beat, and set afire one plaintiff and shot and stabbed another, even though the supervisors knew the parolee had dangerous propensities and they suspected his commission of a separate arson-murder after his release. *Fox v. Custis*, 712 F.2d 84, 88 (4th Cir.1983). See also *Jackson v. Byrne*, 738 F.2d 1443, 1446 (7th Cir.1984) (where two children killed in fire that occurred while firemen were on strike and firehouse across street from fire was unmanned, firemen had no constitutional duty to protect victims, and policemen who barred access to firehouse had no duty to provide rescuers with equipment: "nothing in the Constitution requires governmental units to act when members of the general public are imperiled").

■ A constitutional duty arises only when the persons acting under color of state law have created a special or custodial relationship or are aware of a special danger with respect to a particular victim. *Fox*, 712 F.2d at 88. Thus, when an inmate in the custody of a county institution was found dead, there existed a triable issue as to whether the county's lack of care in hiring and supervising their deputies was negligence creating a foreseeable risk of harm. *Hirst v. Gertzen*, 676 F.2d 1252, 1263 (9th Cir.1982).

In the instant case, however, the defendants had no special or custodial relationship with Ms. Medina. She was simply a member of the general public for whom defendants had no unique responsibility.

■ In the absence of any affirmative state action creating a special relationship,

---

**2.** Plaintiffs argue by negative implication from *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In *Martinez* the Court held that plaintiffs had no § 1983 claim against a parole board when the board released a person who killed plaintiffs' decedent five months later. According to the Court, the murder was "too remote a consequence of the parole officers' action to hold them responsible

under the federal civil rights law." *Id.* at 285, 100 S.Ct. at 559. Plaintiffs contend that the instant fact situation presents a much closer question concerning causation, and therefore, summary judgment is inappropriate. While *Martinez* is not affirmative authority for plaintiffs' position, this Court recognizes that if causation were the sole issue, plaintiffs might be able to defeat this motion.

plaintiffs' sole argument is that, under the circumstances, Officers Huerth and Garcia were aware of a special danger that created a duty to intervene sooner. This Court is unaware of any cases finding the existence of a constitutional duty to act outside of the custodial or special relationship situation. Even if such cases did exist, however, the Court could not, for a number of reasons, find that the instant defendants were aware of a special danger imposing a duty to intervene in Ms. Medina's behalf.

First, no one singled Ms. Medina out as the victim. While an argument might be made that the officers were aware of a special danger to Jimenez and Castellanos, it would be inappropriate to impose a constitutional duty to protect *all* of the patrons in La Posada that night.

Second, everything happened so quickly that the officers had little opportunity to develop any awareness of a special danger. Very little time elapsed between the escalation of hostilities and the shooting of Ms. Medina.

Last, the Court does not believe that the duty of an undercover officer to intervene should be triggered as quickly as that of a uniformed police officer. Thus, even if the officers had a duty to act, they did not have a duty to intervene immediately.

Therefore, the Court holds that the officers had no constitutional duty to intervene. They created no special relationship nor were they aware of any special danger such that their actions constituted a "deprivation" within the meaning of the Fourteenth Amendment. The absence of a constitutional duty entitles all defendants to summary judgment in their favor on plaintiffs' § 1983 claims.

### 2. *Municipal Liability*

Even if Officers Huerth and Garcia had a constitutional duty to intervene, the Court would nevertheless grant summary judgment in favor of defendant City of Santa Ana because a municipality cannot be liable for the acts of its employees unless they are acting pursuant to a policy. *Monell v.*

*Department of Social Services of the City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

Under *Monell*, a city may be liable under § 1983 based on a "custom" or "usage" even if this custom has not received formal approval. The Court, however, indicated that such a practice should be "permanent" or "well-settled." *Id.* at 690–91, 98 S.Ct. at 2035–36. A court may also infer a policy from the omissions of supervisory officials although plaintiff needs to show acquiescence in a prior pattern in order to prove the existence of a policy in this manner. *Turpin v. Mailet,* 619 F.2d 196, 200, 202 (2d Cir.1980).

In the instant case, plaintiffs have presented no evidence from which it may be inferred that defendants had a policy of maintaining cover even in the face of imminent violent crime. The evidence of use of the procedure of calling back-ups is unavailing because there is no evidence that such a procedure was used in other life-threatening situations. The testimony of the defendant police officers was that they used this procedure regularly in dealing with non-violent liquor law violators, who normally present no immediate threat to anyone other than themselves. Thus, it is impossible to infer from numerous instances of maintaining cover when dealing with these people that there was a policy of maintaining cover when faced with imminent violent crime.

In addition, all of the evidence elicited from sources within the police department indicates that there was no such policy. The defendant officers and their supervisors all deny the existence of such a policy and maintain instead that the city trains undercover officers to use their discretion concerning disclosure because each situation presents different considerations. A policy allowing for discretion only makes sense. Requiring disclosure and intervention in every situation would do serious harm to the use of undercover officers while not ever permitting intervention would be foolhardy. Recognizing that ev-

ery case is different, it is sensible that officers be taught to use their discretion, which is what the officers did in this case.

In *Harris v. City of Roseburg,* 664 F.2d 1121 (9th Cir.1981), after a policeman aided a citizen in the unlawful repossession of a debtor's truck, the debtor alleged that the city had a policy of assisting creditors in depriving debtors of property without giving them an opportunity to be heard. Finding no evidence of such an unlikely official policy, the Ninth Circuit affirmed summary judgment in favor of the defendants. *Id.* at 1130. Likewise, in this case, there is no evidence that the city propagated a policy that promoted maintaining cover over protecting lives.

Finally, plaintiffs make the argument that the city and the police chief ratified the alleged policy by not taking remedial action. For this proposition plaintiffs cite *Turpin v. Mailet,* 619 F.2d 196 (2d Cir. 1980). However, *Turpin* involved a situation in which a policeman allegedly had arrested a teenager out of malice *after a previous incident* in which the same policeman had been found guilty of using excessive force against that same teenager. This case is completely different. There is no evidence of any problems arising in Santa Ana from the police's undercover activities prior to this case. If it were found that the officers' conduct *in this case* was wrongful and *then* Santa Ana took no remedial action, ratification might apply in the *next case.* However, the *Turpin* argument does not apply to the facts in the record before this Court.

Therefore, since plaintiffs have produced no evidence of a policy for which the city can be liable, summary judgment in its favor is appropriate. Plaintiffs have failed to respond to the city's affidavits and "set forth specific facts showing that there is a genuine issue for trial." Federal Rule of Civil Procedure 56(e). Moreover, because there is no evidence that the alleged policy exists, the Court must reject plaintiffs' argument that the police chief is liable as the propagator of that policy.

### 3. *Good Faith Immunity*

An alternative ground for summary judgment also exists concerning Officers Huerth and Garcia: they are protected by good faith immunity. Good faith immunity is a qualified federal immunity, and it is available to police officers in § 1983 actions. *Harris v. City of Roseburg,* 664 F.2d at 1127. It applies unless the officers "knew or reasonably should have known" that the action would violate another's constitutional rights or that the action was taken with the "malicious intention" of effectuating such a deprivation. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). Thus, the defense has two elements: (1) an objective requirement that, under the circumstances, there existed reasonable grounds for the belief that the action was appropriate; and (2) a subjective requirement that the officer actually acted in good faith. *Harris,* 664 F.2d at 1128.

Under the objective standard, reasonable grounds existed for Officers Huerth and Garcia to believe that they were taking appropriate action. When the officers saw the gun, heard tempers flaring, and realized Jimenez had sent for his gun, they called for back-up. Given the facts that they were undercover, that guns and heated argument are not unusual in such an establishment, and that they themselves might be in danger if they acted by themselves, the officers called for back-up rather than immediately intervening. Under the circumstances, such conduct is objectively reasonable.

As for the subjective standard, the officers did act in good faith. First, they did act. When tempers began to rise, they called for back-up. Second, once the shooting occurred, the officers pursued the suspect at no small risk to their own safety. Therefore, there was no "malicious intention" to violate another's constitutional rights.

In sum, the officers' conduct meets both the objective and subjective requirements for good faith immunity. Summary judg-

ment is thus appropriate in their favor on this ground as well as on the constitutional duty rationale.

### B. *Claims Under 42 U.S.C. §§ 1985, 1986*

Defendants also allege that Officers Huerth and Garcia conspired to violate Ms. Medina's civil rights and that Chief Davis failed to prevent that conspiracy and later ratified it. The Court grants Summary Judgment on these claims for two reasons.

First, since no basis exists for the § 1983 claims, there is no basis for these claims. There can be no action for conspiracy under 42 U.S.C. § 1985 or for failure to prevent a conspiracy under 42 U.S.C. § 1986 when no civil rights violation has occurred.

Second, the Ninth Circuit has stated that § 1985 is "not intended to apply to all tortious, conspiratorial interferences with the rights of others, but only to those which were founded upon some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Briley v. California,* 564 F.2d 849, 859 (9th Cir.1977). The instant complaint makes no allegation of class-based discrimination. The Court might attempt to infer discrimination against Hispanics, but plaintiffs produced no evidence to support the inference. Any other class that could be applicable (e.g., the class of people unprotected because of undercover officers' refusal to intervene) is not one that is subject to an "invidiously discriminatory animus." Therefore, the § 1985 claim is defective, and the § 1986 claim falls along with it.

Based on the foregoing, it is

ORDERED that summary judgment shall be entered against plaintiff and in favor of all defendants as to each claim under 42 U.S.C. § 1983, 1985, and 1986. It is further

ORDERED that defendants' motion for attorneys fees is denied without prejudice to a separate motion brought in accordance with the Local Rules.

The Court also orders that the Clerk serve copies of this Order and Judgment upon all the parties by United States mail.