Edward DUDOSH, Administrator of the
Estate of Kathleen Dudosh

v.

CITY OF ALLENTOWN, Dean
Schwartz and Daniel Warg

Civ. A. No. 85–4066.

United States District Court,
E.D. Pennsylvania.

May 18, 1987.

Richard J. Makoul, Richard J. Orloski, Allentown, Pa., for plaintiff.

Robert G. Hanna, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

The above captioned action was previously before this Court pursuant to the defendants' motion to dismiss the plaintiff's complaint for failure to state a claim upon which relief could be granted. We granted said motion in part and dismissed the plaintiff's pendent state law claims against the City of Allentown in their entirety. We also dismissed the plaintiff's state law claims against the individual defendants Schwartz and Warg for any "negligent acts

and/or omissions" that they may have committed. *See Dudosh v. City of Allentown*, 629 F.Supp. 849 (E.D.Pa.1985). We denied the defendants' motion insofar as it sought dismissal of the plaintiff's §§ 1983 and 1985(3) civil rights claims, 42 U.S.C.A. §§ 1983 and 1985(3) (West 1981), and his pendent state law claim against the individual defendants alleging that their actions constituted "actual malice or willful misconduct" on their part, *Id.*

Presently before us is the defendants' motion for summary judgment. We may grant the motion only if there is no genuine issue as to any material fact and the defendants are entitled to a judgment as a matter of law. Federal Rule of Civil Procedure 56(c). As we previously stated in *General Sound Telephone Co., Inc. v. AT & T Communications, Inc.*, 654 F.Supp. 1562 (E.D.Pa.1987)

It is now quite clear that as to issues on which the nonmoving party bears the burden of proof, summary judgment may be granted where the moving party demonstrates that there is an absence of proof to support the nonmovant's claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. [2548], 91 L.Ed.2d [265] (1986). Stated in another way, there is no genuine issue of material fact in dispute if there is insufficient evidence to establish a claim or defense.

When such an argument is made by the moving party, it is the responsibility of the proponent of the claim or defense to demonstrate to the Court that there is sufficient evidence available from which a jury might return a verdict in his favor under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. [2505], 91 L.Ed.2d 202 (1986); *Bushman v. Halm*, 798 F.2d 651 (3d Cir.1986).

Moreover, the evidence relied upon must be examined in light of the proponent's evidentiary burden at trial. In other words, the Court is obliged to measure the evidence available to defeat the summary judgment motion against the standard to be applied by the jury at trial, whether it be preponderance of the evidence, clear and convincing evidence,

or some other standard imposed by the substantive law which governs the issue. *Id.*

Thus, in determining whether there are factual issues for trial, the Court must examine the record in light of the elements necessary to establish the claim or defense in question and in light of the standard under which the jury will be required to consider the evidence. Only those issues essential to the claim or defense can possibly be material and such issues can be in dispute only if the nonmovant can point to sufficient conflict in the evidentiary sources listed in Fed.R.Civ.P. 56(c) and (e) such that a jury's resolution of the issues is required. The nonmovant may not conjure a genuine issue of material fact by relying upon the allegations of the complaint alone or by relying upon evidence that is merely colorable rather than significantly probative. *Anderson* [477 U.S. at ——, 106 S.Ct. at 2511,] 91 L.Ed.2d 212.

On the other hand, the Court is precluded from considering credibility or weight of the evidence and from drawing its own inferences from the evidence. *Id.* [477 U.S. at ——, 106 S.Ct. at 2513, 91 L.Ed.2d] at 216.

*Id.* 654 F.Supp. at 1564; *see also, Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987); *J.E. Mamiye & Sons, Inc. v. The Fidelity Bank*, 813 F.2d 610 (3d Cir.1985) (Becker, J., concurring); and *Equimark Commercial Finance Company v. C.I.T. Financial Services Corporation*, 812 F.2d 141 (3d Cir.1987). In other words, all inferences from the evidence must be drawn in favor of the nonmoving party. With these precepts in mind, we proceed to examine the merits of the defendants' motion.

I. *The Facts.*

The parties essentially do not dispute the facts of this case. They are as follows: In July of 1984, a man named Richard P. "Tex" Miller assaulted the plaintiff's decedent, Kathleen Dudosh, allegedly to an extent that she required hospitalization. Miller assaulted the plaintiff again in her hospital room. The Allentown Police Depart-

ment did not receive a report of either incident.

On October 19, 1984, the deceased obtained a temporary Protection-from-Abuse (PFA) order from the Court of Common Pleas of Lehigh County of the Commonwealth of Pennsylvania pursuant to 35 Pa. S.A. § 10181–10190 (Purdon's Supp.1986). The deceased, in her petition for the temporary PFA order, stated that she and Miller had resided together for approximately two and one-half years, though they were not married. She further alleged in the petition that on October 10, 1984, Miller threatened to kill her and "anyone who got in his way"; that he had a drinking problem and had been hospitalized many times for alcohol abuse; that in October, 1984, Miller "pushed" the deceased, "hit her around", "smashed her furniture and made several threats to kill" himself and her; that on another occasion in October, 1984, Miller "beat up" the deceased two days in a row, requiring her hospitalization for "two weeks", during which Miller assaulted her again; and that in August, 1984, Miller "choked her so hard that he lifted her off the ground two feet while heavily drunk". (Defendants' Motion for Summary Judgment, Paper # 15, Ex. E.) The Allentown Hospital records contained in the record before us, however, reflect that the deceased was admitted to the hospital on July 18, 1984, and was apparently discharged the following day. The records list her "admitting diagnosis" as "depressive disorder". (Id. at Ex. B). While the records do mention complaints by the decedent that Miller had assaulted her, nowhere do the hospital records refer to any physical injuries which required that she be hospitalized. More importantly, the plaintiff has presented no evidence that any of the incidents described in the petition were ever reported to the Allentown police.

On the same day, i.e., October 19, 1984, at 5:11 P.M., the Allentown Police Department received a report of an "unwanted person" at the apartment building where the decedent resided. The complaint had been filed by a "concerned neighbor who heard what she believed to be a disturbance between the (decedent) and (Miller)".

(Defendants' Motion for Summary Judgment, Paper # 15, Ex. G). The decedent informed the Allentown police officer who responded to the call that there was no problem. (Id.; see also, deposition of Daryl Hendricks, plaintiff's responses to defendants' summary judgment motion, Paper # 16, Appendix (hereinafter, simply "Appendix") IV).

On October 20, 1984, at 1:30 P.M., the Allentown Police Department received a report of an "unwanted person" at the decedent's residence. Upon the patrolman's arrival, the decedent exhibited the temporary PFA order she had obtained the prior day and informed the officer that Miller had appeared at her apartment door the previous night in an intoxicated state. She stated that she had allowed him to sleep there, but called the police when he did not wake up and leave. The patrolman told Miller to leave and he complied. (Defendants' Motion for Summary Judgment, Paper # 15, Ex. H; see also, deposition of Joseph Stauffer, Appendix III, pp. 3–5).

On November 21 and December 7, 1984, the Allentown police were again called to the decedent's apartment. On both occasions, Miller was again removed from the scene without arrest. (Defendants' Motion for Summary Judgment, Paper # 15, Exs. I and J).

On December 9, 1984, a neighbor of the decedent who resided in the same apartment building reported a "prowler" to the Allentown police. The patrolman who responded to the call learned upon arrival that the "subjects" reported on the fire escape of the structure resided in the building and were using the fire escape due to a "10–40" sleeping in the "breesway (sic)". (Defendants' Motion for Summary Judgment, Paper # 15, Ex. K; see also, deposition of Thomas Houck, Appendix IV, pp. 3–15). The patrolman arrested the "10–40", i.e., Tex Miller, transported him to Allentown Police Headquarters and cited him as a "public drunk". (Id. at Ex. L).

On January 21, 1985, the Lehigh County Court of Common Pleas made the temporary PFA order a permanent order of the

court. (Plaintiff's Complaint, ¶ 15, and Defendants' Answer, ¶ 15). The order directed Miller to refrain from abusing or threatening to abuse the decedent and not to go near her residence. The court further ordered that copies of the order be served upon the Allentown Police Department as well as Miller, and that if Miller violated the order he could be found in violation of the Protection From Abuse Act and/or in indirect criminal contempt of the court. (Plaintiff's Supplemental Memorandum of Law to Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, Paper # 7, Ex. A); *see also, Dudosh v. City of Allentown,* 629 F.Supp. at 845, n. 7.

On January 24, 1985, at 1:49 P.M., the deceased filed another report of an "unwanted person" at her residence with the Allentown Police Department. Miller was again sent on his way, but he was not arrested. (Defendants' Motion for Summary Judgment, Paper # 15, Exs. M and N; *see also,* deposition of Michael S. Popovich, Appendix IV, pp. 3–6).

On January 25, 1985, at 3:58 A.M., the individual defendant Warg transported the decedent to "Turning Point", a non-profit organization providing social services to abused spouses. Warg stated in his report that the decedent informed him that Miller was knocking on her door and driving around the block. Warg did not see Miller in the area. (Defendants' Motion for Summary Judgment, Paper # 15, Ex. P; *see also,* deposition of Daniel Warg, Appendix VI, pp. 31–39).

On January 25, 1985, at 9:15 A.M., the decedent filed a complaint with the Allentown police that Miller was following and harrassing her. The reporting officer noted the PFA order against Miller, and stated that Miller could not be located in the area. (Defendants' Motion for Summary Judgment, Paper # 15, Ex. Q; *see also,* deposition of Carl W. Held, Appendix III, p. 9).

On January 26, 1985, the Allentown police received another report of an "unwanted person" from the deceased, who reported that Miller was at her residence harrassing her. Once again, the responding police officer could not locate Miller following a search of the area. (*Id.* at Ex. R). Later that same day, however, Miller was arrested for indirect criminal contempt pursuant to the PFA order when he was found on the front porch of the decedent's dwelling. He was committed to the County Prison. (Defendants' Motion for Summary Judgment, Paper # 15, Ex. S; *see also,* deposition of Donald Wayne Leauber, Appendix II, pp. 7–9). The record does not disclose the disposition of the charge.

On March 17, 1985, the Allentown police received a report of an "attempted entry" into the decedent's residence from Kathleen Dudosh. The report filed by the responding officer, Balliet, states that, "(Miller) has threatened to kill the complainant and everyone that lives with her in her apartment". (Defendants' Motion for Summary Judgment, Paper # 15, Ex. U). The reporting officer noted that the decedent possessed a PFA order against Miller. Finally, he reported that, "complainant states that she is afraid that the suspect will come back and try to make good his threats. The suspect also left a note on the complainant's mail box that said (next)". (*Id., see also,* deposition of James Balliet, Appendix II, pp. 4–8, 10 and 16). (Parentheses in original).

The record before us indicates that a copy of Balliet's March 17 report was forwarded to the Allentown Police Department's Detective Bureau. The report filed by the detective who received the patrolman's report states the following:

This office did no further follow up investigation on this matter because of the above facts. *It has been our policy not to get involved in matters of this nature. Usually the parties are told to bring private prosecution because most times they get back together after the incident causing the separation.* This fact was verified during the investigation in incident 85–16022 on 28 March 1985, when neighbors showed that Mr. Miller had been with Miss Dudosh on a number of occasions since the abuse papers were served. On a number of occasions he had stayed with Miss Dudosh overnight.

(*Id.*) (Emphasis added). The detective did not file this report, however, until March 29, 1985, the day after Miller murdered the decedent. The detective testified in his deposition that he received a copy of the report, filed by Balliet on Sunday, March 17, the following day, Monday, March 18, when his shift began at 3:00 P.M. and he picked up all the reports in the Detective Bureau's "bin". He stated that following the decedent's murder, his superiors asked him why he had performed no follow-up work on the report filed by Balliet. In response to the inquiry, he filed the March 29 report partially quoted above. The detective also explained in his deposition that the "policy" of not getting involved, referred to in his report, was not a policy adopted by the Allentown Police Department in general, but rather, was a policy followed by the Detective's Bureau. He testified that the Bureau "did not get involved in any domestic cases ..., unless there was physical abuse or physical harm naturally then like aggravated assault. Other than that they would advise the shift, the uniform (sic) who handle any of those complaints". (Appendix IV, deposition of James McCurley, Jr., p. 9).

On March 28, 1985, Miller shot and killed the decedent and then committed suicide. The decedent had on that date again contacted the Allentown Police Department to request their assistance when Arlene Bell, the individual who lived in the apartment below the decedent, informed her that Miller had entered Dudosh's apartment through a window at the top of a fire escape on the side of the building. (Appendix VIII, deposition of Arlene Bell, p. 11). The individual defendants responded to the decedent's call for help. Upon their arrival, the decedent was standing in front of the apartment building. The trio, after the decedent handed Warg a copy of the PFA order, proceeded to ascend the stairs to the second floor of the apartment building where the entrance to the decedent's apartment was located. Arlene Bell testified that prior to the three ascending the stairs, the decedent asked her whether Miller was "still up there". (*Id.*) Bell testified that she responded, "Yes, he is still up there",

to which the decedent responded, "Well, I have two police officers with me to go upstairs". (*Id.*) Bell testified that she then told the decedent, "You are going to be killed", "they can't do anything to protect you", "Don't go up. Stay down here and let them go up". (*Id.*) Bell explained, however, that when she said, "You are going to be killed", she didn't mean with a gun, but rather, "physically, because he used to beat her". (*Id.*) She also testified that in response to her invocations not to go upstairs, the decedent stated, "No; I can talk to him ... I can handle him". (*Id.*) Both Schwartz and Warg testified in their depositions that they did not hear any of this conversation. (See Appendix V, deposition of Dean Schwartz, p. 34, and Appendix VI, deposition of Daniel Warg, pp. 50–52). Nor has the plaintiff adduced any evidence whatsoever that would tend to contradict their testimony on this subject. At no time did Schwartz and/or Warg direct the decedent to remain outside or prevent her from accompanying them upstairs. It is also clear that the individual defendants did not force the decedent to accompany them to her apartment. The only inference that may be drawn from the record is that the decedent willingly and of her own volition escorted the police officers to her apartment.

Upon arriving at the apartment's entrance, the decedent unlocked the door. The door was swung open. Officer Schwartz yelled, "He has a gun". Schwartz stepped back from the doorway. Miller entered the doorway and fired a single shotgun blast into the chest of the decedent. Miller withdrew into the apartment. The individual defendants withdrew down the stairway. Miller at some point shortly thereafter committed suicide by firing the same shotgun he had used to kill the decedent into his own chest. (See Appendix V, deposition of Dean Schwartz; Appendix VI, deposition of Daniel Warg; and Appendix VIII, deposition of Arlene Bell).

The plaintiff in his complaint, as administrator of the decedent's estate, sets forth three primary legal theories upon which he

contends that he is entitled to recovery against the defendants. The plaintiff first asserts that the individual defendants deprived the decedent of her constitutional rights under the Due Process Clause of the Fourteenth Amendment. He next contends that the individual defendants deprived the decedent of her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment. The plaintiff's Equal Protection claim is accompanied by an assertion that the individual defendants conspired to deprive the decedent of her right to equal protection of the laws in violation of 42 U.S.C.A. § 1985(3) (West 1981). The plaintiff premises the liability of the municipality for the alleged deprivation of the decedent's constitutional rights upon two theories, both, of course, under 42 U.S.C.A. § 1983 (West 1981). The first is that the individual defendants acted pursuant to a "policy" approved, encouraged and acquiesced in by the City of Allentown. The second is that the City's alleged non-existent or grossly inadequate rules, regulations or procedures and its failure to properly train the individual defendants resulted in the deprivation of the decedent's Fourteenth Amendment rights to due process and equal protection. The plaintiff's third and final theory of recovery is contained in a pendent state law claim in which he asserts that the individual defendants should be held liable for the decedent's death because they intentionally, willfully and wantonly failed to protect the decedent because of her sex such that their actions constituted actual malice or willful misconduct on their part. We shall address the defendants' motion for summary judgment as to each of the plaintiff's claims *seriatim*.

## II. *The Motion.*

### A. The Due Process Claim.

In our memorandum denying the defendants' motion to dismiss the plaintiff's claim that the individual defendants deprived the decedent of her Fourteenth Amendment due process rights by failing to provide her with adequate police protection, we concluded, relying heavily upon the Third Cir-

cuit Court of Appeals' decision in *Estate of Bailey By Oare v. County of York ("Bailey"),* 768 F.2d 503 (3d Cir.1985), that we could not say as a matter of law that the plaintiff could prove no set of facts upon which a jury could conclude that the individual defendants deprived the plaintiff's decedent of her due process rights. We premised our ruling on the belief that the plaintiff had alleged in his complaint sufficient facts upon which a "special relationship" could be found to have existed between the defendants and the decedent, thereby vesting in the decedent a constitutional right to adequate police protection. *See Dudosh v. City of Allentown,* 629 F.Supp. at 855. Presently before us, however, is a motion for summary judgment. The burdens upon the parties in this context at variance with the burdens they faced in the context of a motion to dismiss for failure to state a claim need not be discussed since they are apparent by comparison of our earlier opinion and our discussion above as to the standards we are required to apply in disposing of a summary judgment motion.

Subsequent to our decision on the defendants' motion to dismiss, we became aware of a number of additional cases which we believe merit discussion prior to addressing the defendants' summary judgment motion as to the plaintiff's due process claims.

The Seventh Circuit Court of Appeals in *Walker v. Rowe,* 791 F.2d 507 (7th Cir. 1986), was faced with a due process claim similar to that asserted by the plaintiff here. In *Walker,* prison guards and the estates of deceased guards brought actions against officials of the Illinois Department of Corrections claiming that the defendants had deprived the injured and deceased guards of their due process rights by failing to provide them with safe working conditions. In rejecting the plaintiffs' claims, the court stated that:

> The defendants did not kill or injure the guards; prisoners did, and this makes all the difference. (citation omitted) To see why, consider the language of the due process clause of the (F)our-

teenth (A)mendment, on which the guards rely: '(N)or shall any State *deprive* any person of life, liberty or property without due process of law ...' The constitution ... is a constraint on the state's power to act, a prohibition on the misuse of official power. (citation omitted) It does not require the state to guarantee life, liberty or property against invasion by private actions ...

'Due process' does not mean 'due care'. *Davidson v. Cannon,* [474] U.S. [344], 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) ...

The level of safety to be provided *by* the police to the people ... is determined by political and economic forces, not by juries implementing the due process clause.

792 F.2d at 509. (Emphasis in original).

The First Circuit Court of Appeals in a case even more analogous to the case *sub judice* similarly stated that:

The (F)ourteenth (A)mendment ... does not protect against the deprivation of life *by any person at all,* but only against the deprivation of life *by the state* without due process. Where, as in these circumstances, the victim dies at the hands of a private individual who was neither an agent of the state nor employed by the state, can it be said that *the state* deprived her of life without due process? If not, there was no violation of the (F)ourteenth (A)mendment, even though the failure of state officials to protect the victim contributed to her death.

*Estate of Gilmore v. Buckley,* 787 F.2d 714, 719 (1st Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986); *see also, Williams v. City of Boston,* 599 F.Supp. 363 (D.Mass.1984), *affirmed,* 784 F.2d 430 (1st Cir.1986); *Archie v. City of Racine,* 627 F.Supp. 766 (E.D.

Wis.1986); and *Bernstein v. Lower Moreland Township,* 603 F.Supp. 907 (E.D.Pa. 1985).

The theme of the cases cited above is that the Fourteenth Amendment's Due Process Clause does not impose upon the states an obligation to provide their citizens with public services, more specifically, adequate police protection. Concomitant with this theme is the general rule of law that a state, or a political subdivision thereof, cannot be held liable under the Due Process Clause, through § 1983, for its failure to provide such protection. *See Dudosh v. City of Allentown,* 629 F.Supp. at 583. As with most, if not all, rules of law, however, there are exceptions to the general rule.

The Third Circuit Court of Appeals in *Bailey, supra,* stated that the existence of a "special relationship" between the state and a private individual may place upon the state an affirmative obligation to protect that individual.[1] The Seventh Circuit Court of Appeals has quite appropriately stated that, "The contours of what constitutes a 'special relationship' between a municipality, acting through its officials, and its citizens are hazy and indistinct". *Ellsworth v. City of Racine,* 774 F.2d 182, 185 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). In *Bailey,* the Third Circuit concluded that such a "special relationship" did exist, based on the allegations of the complaint, between a child murdered by her mother and a third party and the defendant county.[2] The Seventh Circuit Court of Appeals reached the same conclusion in *White v. Rochford,* 592 F.2d 381 (7th Cir.1979). In that case, the police arrested the driver of a car containing three children passengers on the Chicago Skyway in cold weather and abandoned the children. The court concluded that the actions of the police violated the due process clause as undue incursions on the per-

---

1. We hasten to add at this point that the "special relationship" described by the Third Circuit in *Bailey* is in no way based upon some notion of a common law tort duty akin to that which might serve as the basis of a negligence action; rather, the "special relationship", and the obligations placed upon the state where such a relationship exists, are strictly of a constitutional magnitude.

2. *But see, DeShaney v. Winnebago County Department of Social Services,* 812 F.2d 298 (7th Cir.1987) in which the Seventh Circuit rejected the Third Circuit's reasoning in *Bailey* in an identical case.

sonal security of the children and as a state activity which "shocks the conscience", since the police could not avoid knowing the dangers to the children from the cold weather, the traffic and their actions. As stated by the same Circuit Court in a different case,

> If the state puts a man in a position of danger *from private persons* and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982) (Emphasis added).

■ Here, the plaintiff alleges in his complaint and asserts in his memorandum in opposition to the defendants' motion for summary judgment that the individual defendants "took" the decedent upstairs to her apartment and "instructed" her to open the apartment's door and to enter before them while they stood back from the entranceway. (*See* Plaintiff's Complaint, ¶ 22, and Plaintiff's Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment, Paper # 16, p. 13). The plaintiff, however, has failed to adduce any evidence from which a jury could reasonably infer that such was the case; rather, the only inference a jury could reasonably draw from the evidence of record is that the decedent willingly accompanied the police officers to the entrance to her apartment and of her own volition opened the apartment door behind which stalked her murderer. The plaintiff has also failed to present any evidence that the decedent was in any way mentally incompetent. Thus, this does not present a case where the state placed a person in a position of danger only to abandon him.

A large part of our discussion in our prior opinion disposing of the defendants' motion to dismiss was devoted to the relationship between the decedent and the defendants, *as alleged in the plaintiff's complaint*. Based on the *evidentiary record* before us and further analysis of the Third Circuit's opinion in *Bailey,* we do not reach the same conclusion as we did in our prior opinion, *i.e.,* that a "special relationship" of a constitutional dimension existed between the decedent and the defendants, such that a failure by the defendants to adequately protect the decedent from Miller constituted a deprivation of her substantive due process rights.

The "special relationship" rule has its genesis in the Supreme Court's decision in *Martinez v. California (Martinez),* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). In *Martinez,* the plaintiffs alleged that the defendant state officials had deprived their decedent of her life without due process of law by releasing a parolee, a mentally disturbed, convicted sex offender, who had been imprisoned with a recommendation that he not be paroled, when the state officials knew or should have known that his release created a clear and present danger that he would commit another violent crime, *viz.,* the murder of the plaintiffs' decedent, a fifteen year old girl. In sustaining the state trial court's dismissal of the plaintiffs' § 1983 action, the Supreme Court concluded that the defendant state officials did not "deprive" the decedent of her life within the meaning of the Due Process Clause and that the victim's death was too remote a consequence of the parole officers' action to hold them responsible under § 1983. The Supreme Court also stated that it need not and did not decide whether a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the paroling of a prisoner. 444 U.S. at 285, 100 S.Ct. at 559, 62 L.Ed.2d at 489.

Subsequent similar cases have required lower courts to tangle with the issue of which side of the *Martinez* "line" the facts of that particular case fell on. In *Bailey,* the Third Circuit concluded that the facts of that case lay on the side of the line opposite of *Martinez* and on the side of a constitutional violation. As might be expected, the plaintiff in this case relies heavily upon the Third Circuit's statement in *Bailey* that, "The significant difference between this case (*i.e., Bailey*) and *Martinez* is the fact that the victim in *Martinez* was a member of the public at large while here the agency was aware of a 'special danger' to (the deceased child)", 768 F.2d

at 511, for his proposition that because of the defendants' awareness of a similar "special danger" to his deceased daughter from a particular individual, his decedent possessed a "special relationship" with the defendants akin to that found in *Bailey*. It appears that the Third Circuit's statement in *Bailey* quoted in the prior sentence, and the plaintiff's argument, are based upon the Supreme Court's observation in *Martinez* that, "the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger". 444 U.S. at 285, 100 S.Ct. at 559, 62 L.Ed.2d at 489. It is clear in this case that the defendants were or should have been aware of a special danger to the deceased from a particular individual. As we stated in our prior opinion,

> the deceased was not just a member of the public at large who through fate and misfortune becomes a victim of crime in a situation over which the police had no control or notice. She was a specific individual who had been subjected to particularized assaults and threats of murder.

*Dudosh v. City of Allentown*, 629 F.Supp. at 855. Nevertheless, we believe that to conclude that a "special relationship" of a constitutional dimension existed between the decedent and the defendants based on this rationale *alone* would be to read too much into the Supreme Court's observation in *Martinez* and too little into the Third Circuit's opinion in *Bailey*. As stated by the Third Circuit in *Bailey*, the defendant county, through its employees, had removed the child from the home, taken her into custody, placed her in the protective custody of another relative, and then returned her to the custody of her mother. Thus, it could be said that the state, having removed the child from the "snake pit" once, simply threw her back into the same pit. Further, the court stated that where an agency knows that a child has been abused, "this *strengthens* the argument that some sort of special relationship had been established". *Bailey*, 768 F.2d at 511, *quoting Jensen v. Conrad*, 747 F.2d 185, 195 n. 11 (4th Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818

(1985) (Emphasis added). We find it significant that the Third Circuit did not state that such knowledge was of *exclusive importance;* rather, it appears that it was just one of many factors which the court relied upon in concluding that the plaintiff had alleged sufficient facts upon which a "special relationship" could be found to have existed between the decedent and the defendants. *Cf. Escamilla v. City of Santa Ana*, 606 F.Supp. 928, 931 (C.D.Cal. 1985), *affirmed*, 796 F.2d 266 (9th Cir.1986) ("constitutional duty arises only when the persons acting under color of state law have created a special or custodial relationship *or are aware of a special danger with respect to a particular victim"*). (Emphasis added).

We do not believe that such knowledge on the defendants' part in this case, by itself, can alone be a basis for a finding of a special relationship of a constitutional nature. Had the plaintiff adduced facts in support of his allegations that the individual defendants indeed "took" the decedent to the apartment door and "instructed" her to open the door and enter before them while they stood back from the entranceway, our analysis, and most likely our conclusion, would have differed. Such action, combined with the defendants' knowledge of Miller's threats to and assaults of the plaintiff's decedent, and his prior weapons violation, might very well have created a "special relationship" analogous to that found in *Bailey*. However, we need not and do not decide this question, since the plaintiff has completely failed to support his allegations of such conduct by the individual defendants.

Whether it is expressed in terms of a lack of a *constitutional duty* to protect the decedent on the defendants' part or a lack of proximate cause between the defendants' conduct and the decedent's loss of her life, the individual defendants' conduct did not rise to the level of a deprivation by the defendants of the decedent's right to due process. We believe that to hold otherwise would recognize the fear expressed by Judge Adams in his dissent in *Bailey* that § 1983 was becoming a federal

tort claims act. As stated by Judge Adams,

> § 1983 was enacted to deal primarily with acts of discrimination by state officials. There is a danger that by extending this important legislation to contexts far removed from Congress' original and overarching purposes, a national state tort claims act administered in the federal courts in effect will be created. Steps in that direction should not be lightly taken since the ultimate outcome of such a course might well be incongruent with our role as federal judges. When a court extends a statute far beyond what was contemplated by Congress, it transgresses the separation of powers.

*Bailey,* 768 F.2d at 513 (Adams, J., dissenting).[3]

The First Circuit Court of Appeals succinctly expounded on Judge Adams's fear when it stated that,

> A contrary disposition of the plaintiffs' claim would 'trivialize' the Fourteenth Amendment by making every negligent act by a state officer that caused physical injury a constitutional violation. The Supreme Court has rejected reasoning that 'would make the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the State'. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 41 L.Ed.2d 405 (1976).

*Williams v. City of Boston,* 784 F.2d at 434. Further, and most importantly, the Supreme Court itself has stated that the "Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss or injury to life, liberty, or property", *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986), since a "lack of due care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent", *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 669, 88 L.Ed.2d 677 (1986).

■ The facts adduced by the plaintiff demonstrate that, even assuming a constitutional duty to protect the decedent existed, which we have concluded it did not, the conduct of the individual defendants was, at most, negligent. Based on the foregoing discussion, they cannot, therefore, be deemed to have violated the decedent's Fourteenth Amendment right to due process. Nor can the fact that the Commonwealth of Pennsylvania, through its Legislature, has chosen to immunize the defendants for such conduct, *i.e.,* negligent acts and/or omissions, under the State's own tort law, alter our decision.[4]

For these reasons, we must grant the defendants' motion for summary judgment as to the plaintiff's Due Process claim.[5]

**B. The Equal Protection Claim.**

**i. The Merits of the Claim.**

The defendants have also moved for summary judgment as to the plaintiff's denial of the equal protection claim asserted under both §§ 1983 and 1985(3). Unfortunately, counsel for both parties have largely failed to address the major points on this issue and we, as a result, have been left unaided by their memoranda in support of their positions.

---

**3.** In citing Judge Adams's dissent, we do so fully cognizant of the fact that we are obligated to follow the rule of law established by the majority of the panel in *Bailey.* We do not believe that our decision today in any way violates that obligation.

**4.** We find it ironic that a statute, *viz.,* Pennsylvania's Political Subdivision Tort Claims Act, 42 Pa.C.S.A. §§ 8541–8559 (Purdon's 1982), which protects the defendants from liability from state law negligent tort claims at the same time perhaps precludes them from ever absolving themselves of the allegations made against them. With this possibility in mind, we emphasize that we express no opinion, positive or negative, as to the propriety of the defendants' conduct. Our statement above that the individual defendants' conduct was, at most, negligent, should not be interpreted as a conclusion on our part that their conduct was, in fact, negligent.

**5.** Based on our decision above, we need not and do not address the individual defendants' secondary argument that they cannot be held liable for any deprivation of the decedent's due process rights on the ground that they are entitled to "qualified immunity" since the constitutional right was not clearly established at the time of the decedent's death. *See, e.g., Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

■ To establish his denial of equal protection claim, the plaintiff must prove that the individual defendants intentionally discriminated against the decedent by failing to accord her the same amount of police protection they would have provided another member of the community not within the decedent's "class". The exact nature of the class-based discrimination alleged by the plaintiff is not clear even now. If it is his contention that the individual defendants failed to protect his decedent because of her sex, *i.e.*, that the individual defendants would have accorded a man better protection, then the defendants must articulate an important government interest for doing so. *See, e.g., Bartalone v. County of Berrien*, 643 F.Supp. 574 (W.D.Mich. 1986); *Lowers v. City of Streator*, 627 F.Supp. 244 (N.D.Ill.1985); and *Thurman v. City Torrington*, 595 F.Supp. 1521 (D.Conn.1984). They have not attempted to articulate such a compelling reason, nor do we believe it is possible for them to do so. If it is the plaintiff's contention that the individual defendants failed to protect his decedent because she had filed a domestic complaint or because she knew her attacker, *i.e.*, that the defendants would have afforded an individual who did not know her attacker or who had filed a non-domestic complaint better protection, then the defendants must articulate a rational reason related to a legitimate government purpose for doing such since no suspect classification or fundamental right is involved. Once again, they have not attempted to articulate such a rational reason. *See, e.g., Thurman v. City of Torrington, supra.* As stated by the district court in *Bartalone v. County of Berrien, supra,*

The (E)qual (P)rotection (C)lause of the (F)ourteenth (A)mendment guarantees to every person within the United States the right to equal protection of the laws. U.S.Const. amend 14. This clause applies to the activities of police agencies, and protects persons from irrational discrimination in either acts of commission or omission ... Police officials cannot refuse to protect a particular class of persons, when under the same or similar circumstances they would protect others, without a rational reason for doing so. 643 F.Supp. at 576–577. Although, as stated earlier, there is no general constitutional right to police protection, adequate or otherwise, the state may not, when it chooses to do so, discriminate in providing such services.

■ Examining the record before us, we believe that the plaintiff has adduced enough evidence from which a juror could reasonably conclude that the individual defendants discriminated against the decedent, either on the basis of her sex or the nature of her complaint, in the manner in which they handled her request for assistance. The depositions of various members of the Allentown Police Department contain numerous statements from which such an inference could be made. For example, Gerald Monaghan, Assistant Chief of the Allentown Police Department, at his deposition, testified in part as follows:

Q: ... Now, if you received a call for an unwanted person and it turned out that the person was not known by the property owner or the complainant, would the manner of apprehension, would the manner of treatment towards the safety of the property owner differ?

.    .    .    .    . .

A: It wouldn't be an unwanted person, in that case it would be a burglar.

Q: How would the manner of apprehension and the safety considerations for the property owner differ?

.    .    .    .    .

A: In that case that would come in or it would be perceived as a felony in progress.

Q: Tell us the difference in procedure.

A: Our policeman as I think I explained before would proceed with extreme caution, may or may not have the guns drawn and probably would be prepared or perhaps anticipate the worst case scenario.

Q: What safety considerations would be employed for the protection of the property owner in that situation?

.   .   .   .   .

A: In a situation like that with the felon unknown to the complainant, we would approach the building alone.

Q: You would not allow the property owner to go up to the door, open the door and be exposed to the intruder?

.   .   .   .   .

A: No.

(Deposition of Gerald Monaghan, Appendix I, pp. 13–15).

Samuel Solivan, a patrolman with the Allentown Police Department, testified in a similar vein in the context of questioning regarding his investigation of an incident in which Miller had broken into the decedent's apartment. The following excerpt illustrates the thrust of the relevant testimony:

Q: Are you aware of whether he was ever pursued and arrested as a result of that incident?

A: No, he was not because if he was I would have been the arresting officer.

Q: Now why wouldn't he have been arrested?

A: Why wouldn't he have?

Q: Yes, if he broke into the apartment in violation of the order.

A: I don't know. Probably because we couldn't find him. On my incident we couldn't find him. We checked his residence and we had a description of the car and we just couldn't find him.

Q: That night?

A: Yes, precisely.

Q: But you could have issued a warrant and then picked him up subsequently?

A: I guess we could have.

.   .   .   .   .

Q: For example, to compare that with a burglar who would break into an apartment and run away, that person would be pursued through arrest warrants and investigations until apprehended?

A: That's correct.

Q: The same policy was not in effect with respect to violators of Protection Against Abuse Orders?

A: *The law is clear when it comes to criminal versus something that's more domesticated.*

.   .   .   .   .

Q: Just to make this clear, the case in which you decided to take no further action and pursue to arrest was a situation where you determined there was evidence that he had broken into the apartment and was in violation of the order and was away when you arrived. He couldn't be found that night?

A: *The only evidence I had was her word.*

Q: You have on other occasions I assume in your experience as a police officer brought arrests on information received from others?

A: True, correct.

Q: That's a common way of bringing an arrest; is it not?

A: *If you're pretty sure the victim is going to show up for the hearing.*

(Deposition of Samuel Solivan, Appendix III, pp. 10–13) (Emphasis added).

The Chief of Police of the Allentown Police Department testified as follows at his deposition:

Q: One further question and I'll let you go. If the police had arrived and determined there was an intruder who did not know Kathleen Dudosh, a total stranger, would that have called for any different procedures in the manner of apprehending the intruder?

.   .   .   .   .

A: *What would have then been reported to us would not have been a domestic call but conceivable (sic) a burglary in progress. Burglarly in progress calls are handled differently then (sic) domestic calls.*

Q: And how is that?

A: Well, if we suspect there's a burglary in progress the first thing we do is seal off the area where the burglary is suspected to be in progress ... *There isn't any relationship between the*

*burglary call and a domestic call. In most burglary calls we don't know who the burglar is.*

. . . . .

Q: And what then would be the best way to protect the person against confrontation by the intruder?

. . . .

A: Just by attempting to remove them from any hazards that may be encountered. We don't allow—if it's a burglary in progress that's a police operation, *and a police operation is entirely different than handling a domestic call where it's a spousal abuse-type situation.* You're trying to draw a relationship between the two and that's impossible.

Q: We don't have a spousal situation here, Chief, in this case.

A: Okay. I'll say this, *you're trying to draw a parallel between a police operation relating to or responding to a burglary in progress and a domestic call and there isn't any relationship. Burglars are generally unknown people. Domestic disturbances we're dealing with someone who we know, at least we don't know, the complainant knows most of the time who is causing it.*

(Deposition of David M. Howells, Sr., Appendix V, pp. 27–30).

As stated above, we believe that a jury could, based on the evidence of record, as illustrated by the passages of deposition testimony quoted above, reasonably infer that the Allentown Police Department adhered to an administrative classification, *i.e.,* the sex of the complainant, the nature of the complaint, or both, in the handling of requests for assistance which violated the Equal Protection Clause of the Fourteenth Amendment.[6] *See, e.g., Thurman v. City of Torrington, supra.* We hasten to add,

however, that this is not the only inference which may be drawn from the evidence of record, nor is it the inference which this Court would necessarily draw. In fairness, the record contains an equal or greater amount of evidence that the police officers of the defendant municipality provided equal protection to all of Allentown's citizens, regardless of their sex or the nature of their complaints. (*See, e.g.,* deposition of David M. Howells, Sr., Appendix V, p. 30). It is for a jury, not this Court, to weigh the evidence and reach a verdict.

ii. Qualified Immunity.

█ As well as arguing that they are entitled to qualified immunity as to the plaintiff's due process claim, we assume that the individual defendants assert the same argument as to the equal protection claim since they fail in their motion for summary judgment to distinguish between the two claims. We reject this argument. The decedent's constitutional right to equal protection of the laws was probably the most clearly established constitutional right she possessed at the time of her death. Thus, it is clear that the individual defendants are not entitled to qualified immunity as to the equal protection claim. *See, e.g., Mitchell v. Forsyth, supra.*

iii. The Liability of the Municipal Defendant.

The municipal defendant argues that it is entitled to summary judgment as to the plaintiff's equal protection claim on the ground that the plaintiff has presented no evidence upon which a reasonable juror could conclude that the individual defendants, if they indeed did deprive the decedent of her right to equal protection, acted pursuant to a municipal policy or custom established by the City, a prerequisite for the imposition of liability upon a municipali-

---

**6.** We note that, in addition to proving that the individual defendants acted pursuant to an administrative classification which violated the Equal Protection Clause, the plaintiff will also be required to prove that the violation of the decedent's right to equal protection of the laws was a proximate cause of her death. We believe that the plaintiff's burden in this regard will be most difficult, if not impossible, to sustain. This is not a case where the police utterly and completely failed to respond to a call for assistance or stood idly by as an assault continued before their eyes. We cannot say, however, as a matter of law, that the plaintiff will not be able to sustain this burden.

ty under the Supreme Court's decision in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ The plaintiff has set forth two theories upon which the municipal defendant should be held liable. The first is that the individual defendants were acting pursuant to a policy approved, encouraged and acquiesced in by the City. Liability premised on this theory clearly satisfies the requirements of *Monell.* It is indeed true that the plaintiff has adduced no evidence that the City had promulgated a written policy administratively classifying complaints received by the police department and prescribing the appropriate responses thereto. Such a written policy is not required however. A municipality may be found to have adopted a policy through silence as a result of its failure to sanction its employees for a pattern of conduct on their part of which municipal policymakers are aware. Stated in another manner, a municipality cannot "acquiesce" in a pattern of conduct by its employees, and then be heard to say that those employees were not acting pursuant to municipal policy. *See, e.g., Mariani v. City of Pittsburgh,* 624 F.Supp. 506 (W.D. Pa.1986).

■ Here, the testimony contained in the depositions of record demonstrates that a written report was prepared each time a police officer responded to a citizen's complaint, and that the report contained a description of what happened and how the officer responded. There is testimony that these reports were submitted to and reviewed by the officer's superiors. Finally, there is testimony by at least one officer that he has never been criticized by his superiors for the manner in which he handled a complaint, including citizen complaints of a domestic nature. (*See* deposition of Daniel Warg, Appendix VI, p. 26).

Based on this testimony, we find that the plaintiff has presented enough evidence to create a genuine issue of material fact as to whether the individual defendants acted pursuant to municipal policy, a policy created perhaps by acquiescence and thus more appropriately described as custom, such that it can be said that such policy or custom caused, *i.e.,* was the "moving force" behind or had an "affirmative link" with, a violation of the decedent's right to equal protection. *See, e.g., City of Springfield v. Kibbe,* — U.S. —, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting).

■ The plaintiff also seeks to hold the municipal defendant liable under § 1983 based on its alleged failure to properly train the individual defendants. Such a theory of liability has proved a continuous sticking point for many district and circuit courts.[7] It was hoped that this very term the Supreme Court would definitively address this issue when it granted certiorari last year in a case for the stated purpose of "resolv(ing) whether a city can be held liable under 42 U.S.C. § 1983 for providing inadequate police training and, if so, what standard should govern the imposition of such liability". *Id.* at 1. Unfortunately, the Supreme Court subsequently dismissed the writ as having been improvidently granted. *Id.; see also, Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791, 804 n. 7 (1985). Further, our own Circuit Court has failed to definitely address this precise question. *See, e.g., Freedman v. City of Allentown,* 651 F.Supp. 1046 (E.D.Pa.1987).

The district court for the Western District of Pennsylvania, in *Mariani v. City of Pittsburgh, supra,* was squarely faced with the issue of whether "inadequate training" could serve as a "policy or custom" sufficient to impose § 1983 liability

---

7. *See, e.g., Hinshaw v. Doffer,* 785 F.2d 1260 (5th Cir.1986); *Grandstaff v. City of Borger, Texas,* 767 F.2d 161 (5th Cir.1985), *reh'g denied,* 779 F.2d 1129; *Kibbe v. City of Springfield,* 777 F.2d 801 (1st Cir.1985), *cert. dismissed,* — U.S. —, 107 S.Ct. 1966, 95 L.Ed.2d 537 (1987); *Voutour v. Vitale,* 761 F.2d 812 (1st Cir.1985), *cert. denied sub nom., Town of Saugus v. Voutour,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); and *Rymer v. Davis,* 754 F.2d 198 (6th Cir.1984), *vacated and remanded sub nom., City of Shepherdsville v. Rymer,* 473 U.S. 901, 105 S.Ct. 3518, 87 L.Ed.2d 646 (1985), *on remand,* 775 F.2d 756, *cert. denied,* — U.S. —, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987).

upon a municipality. The court, in granting the defendant municipality's summary judgment motion assumed, without deciding, that such a claim stated a viable cause of action, but found that the plaintiff had failed to adduce a genuine issue of material fact both as to whether the police had, in fact, been inadequately trained and as to whether the policy or custom of inadequate training had "caused" the plaintiff's deprivation of his constitutional rights. The same court in *Sewell v. Dever,* 581 F.Supp. 556 (W.D.Pa.1984) similarly concluded that the plaintiff had adduced no evidence that the defendant municipality had inadequately trained its police officers in a manner which a juror could reasonably conclude was in reckless disregard for or with deliberate indifference to the rights of citizens. As noted by Justice O'Connor in her dissent in *Kibbe, supra,* where a plaintiff does not assert that the municipality "authorized" the conduct, but rather contends that the methods taught in the city's training program were "inadequate", and if the city had better trained its police officers the unconstitutional conduct would not have occurred, "the causal connection between the municipal policy and the constitutional violation is an inherently tenuous one". *Id.* — U.S. at —, 107 S.Ct. at 1120.

Here, counsel for the plaintiff elicited a number of statements from Allentown police officers either that they had not received or could not recall receiving any training prior to the decedent's death specifically dealing with the handling of domestic complaints. A number of officers, including supervisory personnel, also testified that the handling of such situations was left largely to the "discretion" of the individual officer responding to the call. The plaintiff, however, in response to the defendants' motion for summary judgment, has failed to present any evidence whatsoever, expert or otherwise, that the individual defendants were, in fact, inadequately trained because they had not received any specific instructions on the handling of domestic complaints. At a minimum, the plaintiff was required to present some evidence as to what further training the individual defendants should have received. Likewise, the plaintiff has failed to adduce any evidence that such further training, whatever it might and/or should have been, would have prevented the alleged deprivation of the decedent's constitutional right to equal protection., *i.e.,* "that (the) specific deficiencies in the training the officer(s) received led to the incident of alleged misconduct". *Mariani v. City of Pittsburgh,* 624 F.Supp. at 510. Thus, even assuming, without deciding, that the plaintiff's "inadequate training" theory stated a viable cause of action under § 1983 against the City of Allentown, we find that the City is entitled to summary judgment as to this claim since the plaintiff has failed to create a genuine issue of material fact both as to whether the individual defendants were, in fact, inadequately trained, and as to whether such alleged inadequate training caused his decedent's deprivation of her right to equal protection of the laws.

### III. *The Pendent State Law Claim.*

Finally, we deny the individual defendants' summary judgment motion as to the plaintiff's pendent state law claim alleging that their actions constituted actual malice or willful misconduct. We believe that the Pennsylvania courts would recognize such a cause of action against the individual defendants if they did, in fact, fail to provide the decedent the same amount of protection they would have accorded another person because of the decedent's sex or the nature of her complaint. Thus, it can be said that the plaintiff's state law claim is coextensive with his § 1983 denial of equal protection claim.

### IV. *Summary.*

In sum, we grant the defendants' motion for summary judgment as to the plaintiff's § 1983 due process claim. We deny their motion as to the plaintiff's §§ 1983 and 1985(3) equal protection claim, except insofar as the plaintiff's claim against the City of Allentown is premised upon the "inadequate training" theory. And finally, we

deny the individual defendants' motion as
to the plaintiff's pendent state law claim.

An appropriate order follows.